## UNION SAVINGS BANK AND TRUST COMPANY *v.* DOTTENHEIM.

1. Where money is loaned and interest is calculated at the highest lawful rate for the full period of the loan, and the aggregate of the principal and interest thus calculated is divided into as many notes as the period embraces months, one of such notes maturing each month, the transaction is, under Civil Code, §§ 2877, 2886, infected with usury.

2. The act of 1889 (Civil Code, § 2391), making the provisions of the act of 1888 (Civil Code, § 2388 et seq.), which authorized building and loan associations to make contracts of the character above referred to, "apply to all savings institutions which pay interest to depositors, and whose deposits are not subject to check," is a general law operative throughout the State upon all persons coming within the terms of the act, and is therefore not repugnant to that clause of the constitution which declares that "Laws of a general nature shall have uniform operation throughout the State, and no special law shall be enacted in any case for which provision has been made by an existing general law."

3. Whether the act referred to is applicable to a bank which is both a savings institution and a bank doing a general banking business is a question not raised by the present record.

4. Even if a provision in a special bank charter authorizing it to make contracts of the character of that involved in the present case is inoperative because repugnant to the clause of the constitution above quoted, it is not necessary to so decide in the present case.

SIMMONS, C. J., dissenting.

Argued February 16, — Decided July 19, 1899.

Ejectment.   Before Washington Dessau, Judge pro hac vice.
Bibb superior court.   April term, 1898.

*Steed & Wimberly, Bacon, Miller & Brunson* and *John I. Hall,*
for plaintiff in error.

*Preston & Ayer* and *Hardeman, Davis & Turner,* contra.

COBB, J.   Celia Dottenheim brought an action of ejectment
in the fictitious form against W. H. Ashworth as tenant in
possession; and the Union Savings Bank and Trust Company,
having been served as the true claimant in the case, came in
and defended.   The charge of the court was, in effect, a direc-
tion to the jury to return a verdict in favor of the plaintiff,
which was done.   To this ruling the defendant excepted.   The
evidence established the following facts: Mrs. Dottenheim
agreed to purchase the property now in controversy, at the sum
of $3,250.   Having the sum of $550, she applied to and ob-
tained from the defendant $2,700, the sum necessary to com-
plete the contract of purchase.   Having paid the purchase-
money, she received a warranty deed from her vendor and went
into possession.   To secure the loan from the bank she, con-
temporaneously with the execution and delivery of the deed
from her vendor to her, executed to the bank, in accordance
with the provisions of section 1969 et seq. of the Code of 1882,
a deed to the land which she had purchased.   This deed was
given to secure sixty promissory notes for the sum of $63 each,
falling due monthly during a period of five years, making an ag-
gregate amount of $3,780.   This amount was made up of the
principal of the debt ($2,700) and interest on the same at eight
per cent. per annum for five years; the two amounts being added
together and divided into sixty notes of $63 each.   Contempo-
raneously with the execution of the deed and the delivery of
the notes an agreement was entered into in which it was stip-
ulated that upon default in payment of any of the notes the
entire loan then unpaid should, at the option of the bank, be-
come due and payable, and it should have the right to proceed
to collect the debt, including the expenses and ten per cent.
attorneys' fees which were agreed to be paid.   A number of
the notes were paid promptly at maturity.   Mrs. Dottenheim

finding, however, that she could not pay all of them promptly, afterwards, without any change being made in the papers, made a parol agreement with the bank that a less amount might be paid each month and credited on the debt. The amount to be paid each month was changed twice. Finally she offered to turn the property over to the bank in settlement of the debt. This offer was declined; but she having vacated the property, leaving the premises unoccupied, and the same being about to be sold for the payment of taxes due on it, the bank took possession, paid off the tax fi. fa., and rented the property. Ashworth, sued as tenant in possession, was in possession under the defendant. The amount collected by the bank upon the debt, including what was collected as rent, was $1,-288.65, leaving a balance due $2,787.36, which is still unpaid. The bill of exceptions recites: " Defendant relied upon the provisions of its charter (found in Acts 1889, pages 501 to 507) and upon the provisions of the Act of 1888 (Civil Code, 2388 and 2389), and Act of 1889 (Civil Code, 2391), as authorizing it to charge interest for the entire period of the loan. And, in addition to calling the attention of the court to its charter provision, put in evidence its pass-book, by agreement, as showing its method of doing business, as follows: Interest at the rate of five per cent. per annum, semi-annually compounded, was paid to its depositors; deposits drawing interest from the 1st day of the month after deposit is made. A depositor must always present his pass-book when depositing or withdrawing moneys, in order to have the same entered on the book; the bank reserving the right to require sixty days notice in writing of intention to withdraw deposit; sums of twenty-five cents and upwards will be received on deposit. Married women and minors may make deposits in their own name, and withdraw the same upon their own receipts, and upon the same conditions as other depositors. Any person may become a depositor upon agreeing to the conditions upon which deposits may be made and withdrawn. If a person desires to deposit more than five thousand dollars, it shall be left with the bank to determine the terms. In case of the pass-book being lost, immediate notice shall be given the bank, and the bank shall.

prescribe the conditions on which a new book shall be issued. These rules and regulations governing deposits are printed in the pass-book, and at the top of each page of the pass-book is the provision, 'It is agreed that this contract is opened subject to the conditions as printed.'" The presiding judge held that the transaction between Mrs. Dottenheim and the bank was infected with usury, and therefore that her deed to the bank was void; the clause in the charter of the bank, as well as the sections of the code above referred to, which conferred authority upon savings banks of a certain character to loan money in the manner followed in this case, each being, in his opinion, unconstitutional and void.

1. The question whether at common law "it was lawful in England to take any interest whatever, and if so how much, for the use of money, is veiled in obscurity, and conflicting opinions have been given by writers in regard to it. It is certain, however, that the practice was severely condemned by the church, by whose laws the taking of interest was branded.as a heinous offense, and punished accordingly; and it is also certain that the church was aided in its efforts by the temporal authorities, so that the usurer not only fell under the ban of the church's displeasure, but suffered the forfeiture of his property as well." 27 Am. & Eng. Enc. L. 919; 2 Black. Com. mar. p. 454 et seq. The first English statute regulating the rate of interest was passed during the reign of Henry VIII., and the rate allowed was limited to ten per cent. per annum; it being made a penal offense to charge more. This statute was repealed, during the reign of Edward VI., by an act which absolutely prohibited the taking of any interest whatever; the penalty imposed by the act being a forfeiture of the entire debt. During the reign of Elizabeth the act just mentioned was repealed, and the rate of interest authorized by the statute passed during the reign of Henry VIII. was again made lawful. The rate was reduced to eight per cent. during the reign of James I., and subsequently to six per cent. in the reign of Charles II., and finally to five per cent. during the reign of Queen Anne. Under the law last referred to, the penalty for usury was a forfeiture of the entire debt. This statute remained of force until

the present reign.  In 1755 it was "enacted by the Governor Council and Assembly" of the province of Georgia that the lawful rate of interest in the province should be ten per cent., but the act provided no penalty for charging a higher rate. Colonial Acts of Georgia (1755–1774), p. 61.  In 1759 the legislature of the province, in an act which in its preamble declared that "the high rate of interest" in the province of Georgia was greatly prejudicial to the welfare of the planters and others, provided that no greater rate of interest should be allowed than eight per cent. per annum, and that all contracts in which a greater rate of interest was reserved or taken should be utterly void, and that any person attempting by any deceitful way or means to secure any greater rate of interest should forfeit and lose for every offense "the treble value of the moneys, wares and merchandises, and other things," which were the subject-matter of the transaction.  Prince's Dig. 199, Watkins' Dig. 58, Marbury & Crawford's Dig. 270.  The act of 1759 continued of force until 1822, when it was amended so as to provide that a contract attempting to collect more than eight per cent. interest should not be entirely void, but the principal due thereon should be recoverable at law, and no more, and that no forfeiture should be incurred for charging more than eight per cent., as was provided in the act of 1759.  Acts 1822, p. 139, Dawson's Comp. 488.  This act was superseded by the act of 1845, which provided that contracts reserving or taking above the rate of seven per cent. should be void, except so far as to authorize the recovery of the principal due thereon, and no more.  Cobb's Dig. 393.  In 1857 an act was passed which prohibited banks from discounting or purchasing notes and other evidences of debt at a greater rate of discount than seven per cent. per annum, and declaring that all such notes and evidences of debt so discounted should "be utterly void and of no effect, and irrecoverable in law."  Acts 1857, p. 26.  The Code of 1863 declared seven per cent. to be the lawful rate of interest, defined usury to be "the reserving and taking, or contracting to reserve and take, either directly or by indirection, a greater sum for the use of money than the lawful interest," and provided that the effect of exacting usury should be to an-

nul and make void the contract for the usury, but the lender should have the right to recover the principal sum loaned, with legal interest. It was also provided that all titles to property made as a part of a usurious contract, or to evade the laws against usury, should be void. Code 1863, §§ 2022–2024. The Code of 1868 contained identically the same provisions as the Code of 1863. Code 1868, §§ 2023–2025. In 1871 an act was passed which provided that written contracts to pay interest not exceeding ten per cent. per annum should be valid and binding, and that if the contract were silent as to the rate of interest to be paid, seven per cent. only could be collected; also, that no usury could be recovered back unless suit for the recovery of the same should be instituted within six months after the payment of the usury, and that when a written contract was made to pay more than ten per cent., the lender should not be entitled to recover more than ten per cent. Acts 1871–2, p. 75.

On February 14, 1873, an act was approved which provided that banks doing business in this State might make the same contracts respecting the rate of interest to be paid for the loan of money as were lawful between individuals, and that such banks should be liable to the same penalty only as is incurred by individuals who exact usury. Acts 1873, p. 52. On February 19, 1873, an act of the General Assembly repealing all laws of force in this State upon the subject of usury went into effect. It was therein provided that the rate of interest, when the same was not otherwise agreed upon in writing, should be seven per cent., as had been before that time allowed by law, but that whenever any parties to a contract which bore interest should agree upon any other rate of interest, whether the same be more or less than seven per cent., and should insert the amount or rate of interest so agreed upon in the written contract, the same should be legal and valid, and it should be the duty of the courts to enforce such a contract. Acts 1873, p. 52. The Code of 1873 contains the act just referred to. Code 1873, §§ 2050, 2051. On February 24, 1875, an act passed by the General Assembly went into effect which declared that it should not be lawful for any person to reserve, charge, or

take for any loan or advance of money, or forbearance, any greater rate of interest than twelve per cent., either directly or indirectly, by way of commissions for advances, discount, exchange, or by any contract, or contrivance, or device whatever; and that any person violating the provisions above referred to should forfeit the interest and excess of interest so charged or taken, or contracted to be reserved, charged, or taken, and that the amount of such forfeiture might be pleaded as a set-off in any action for the recovery of the principal sum loaned, by the defendant in the action; that the legal rate of interest should be seven per cent. per annum, and that any higher rate must be specified in writing. Every provision in the charter of any corporation granted since the first day of January, 1863, inconsistent with the provisions of the act, was expressly repealed. Acts 1875, p. 105. In 1879 an act was passed which provided that it should "not be lawful for any person, company, or corporation, to reserve, charge, or take for any loan or advance of money, or forbearance to enforce the collection of any sum of money, any rate of interest greater than eight per centum per annum, either directly or indirectly, by way of commissions for advances, discount, exchange, or by any contract or contrivance or device whatever." The penalty for the violation of this law was the forfeiture of the interest and the excess of interest so charged or taken, or contracted to be reserved, charged, or taken. It was declared that the legal rate should be seven per cent. where the rate was not named in the contract, and that any higher rate must be specified in writing, but in no event to exceed eight per cent. It was further provided that in all suits upon any evidence of indebtedness wherein a greater rate of interest was claimed than seven per cent., it should be incumbent upon the plaintiff to show that no greater or higher rate of interest than the highest lawful rate had been taken, received, retained, or in any way or manner secured, so as to be thereafter had or taken by any device whatever. Acts 1879, p. 184. In 1881 the act of 1879 was amended so as to provide that the penalty for charging more than the lawful rate of interest should be a forfeiture of the excess of the interest only; and

that part of the law which required the plaintiff to prove in
certain cases that no more than the highest rate of interest
lawfully allowed had been contracted for was repealed. Acts
1880–81, p. 149.   The Code of 1882 contains the act of 1879
as amended by the act of 1881, as well as those provisions of
the act of 1875 which were still of force, and also that pro-
vision taken from the usury laws of force before the act of 1873,
providing that all titles made in pursuance of any usurious
contract should be void.   Code 1882, §§ 2050, 2057(a)–2057(g).
The Code of 1895 defines usury in the exact language in
which it was defined by the Codes of 1863 and of 1868.
Civil Code, § 2877.   And the provisions in regard to the rate
of interest and penalties for a violation of the usury laws as
contained in the Code of 1882 are carried forward into the
present Code.   Civil Code, §§ 2876, 2886, 2888–2893.

The above summary of the laws that have been of force in
this State and in England, regulating the rate of interest, shows
that at the time that the colony of Georgia was founded the
law of England prescribed the rate of interest to be charged,
and imposed a severe penalty upon those who attempted to
make contracts for a rate higher than that prescribed; that
from 1755, which is the earliest date that we find the local au-
thorities of the colony dealing with the subject, down to the
present time, with the exception of that period embraced be-
tween February 19, 1873, and February 24, 1875, there have
been of force in the province and in the State of Georgia laws
declaring what rate of interest should be allowed to be charged,
and prescribing that contracts providing for a higher rate
should be unlawful; the violation of such laws being attended
with loss to those violating them, varying with the different
acts, from the mere loss of the right to enforce the contract for
the excessive rate, as was the case in the act of 1755, to the loss
of the entire debt, and in one instance in addition to that the
forfeiture of three times the value of the debt.   At no time in
the history of the State can it be said that usury in the sense
of an exorbitant rate of interest was favored.   During a few
months it was permitted.   At all other times the legislation
was of such a character as to declare that the practice was odi-

ous. Under the present law of the State the rate of interest is fixed. Parties are given the privilege of making contracts for a slightly higher rate than that which would be collectible if no rate is agreed upon in writing; and while the schemes and devices which have been resorted to to evade the usury laws are almost without number, none of them have been successful in passing the scrutiny of the courts' investigations when it was apparent upon the face of the contract, or from evidence introduced showing the truth of the transaction, that there was a manifest purpose on the part of the parties to the contract to enter into a stipulation which would have the effect of compelling the person undertaking the obligation of the contract to pay a sum which would be substantially greater than the principal of the debt and the highest rate of interest allowed by law. It is permissible for a debtor to pay accrued interest at any period of time before the principal of the debt becomes due. A transaction which calls for the payment of the principal at a certain time and payment of interest at certain fixed times during the period that the principal is to run is a valid transaction. The interest may be paid annually, semi-annually, quarterly, or monthly, or in even lesser periods, if the parties see fit so to contract; and the failure to pay any interest which is past due under such stipulation would render such past due indebtedness a liquidated demand, which would itself bear interest. *Pinckard* v. *Ponder*, 6 *Ga.* 253; *Scott* v. *Saffold*, 37 *Ga.* 384; *Calhoun* v. *Marshall*, 61 *Ga.* 275; Mowry v. Shumway, 44 Conn. 493; Iron Works v. Lottimer, 25 Ohio St. 621; Mowry v. Bishop, 5 Paige, 98; Tousey v. Robinson, 1 Met. 663; Tallman v. Truesdell, 3 Wis. 393; Goodrich v. Reynolds, 83 Am. D. (Ill.) 240; Newton v. Woodly (S. C.), 32 S. E. Rep. 531. It is also well settled that a contract providing for the payment of the highest lawful rate of interest in advance is not usurious; though many of the courts which recognize this as an established rule express doubts as to whether upon principle such practice should be allowed to prevail. Bank of Newport v. Cook, 29 L. R. A. (Ark.) 761, and notes; Insurance Co. v. Sturges, 2 Cow. 664; Fleckner v. Bank of the United States, 8 Wheat. *338; English v. Smock, 34 Ind. 115; Parker v. Cous-

ins, 44 Am. D. (Va.) 388; Fowler v. Trust Company, 141 U. S. 384; Cole v. Lockhart, 2 Ind. 631; Marvine v. Hymers, 12 N. Y. 223; Tholen v. Duffy, 7 Kan. 405; Perley, Int. 224, and cases cited; Bank v. Bissell, 12 Pick. 586; Bank v. Durkee, 1 Vt. 400; Manhattan Company v. Osgood, 15 Johns. 162; Bank v. Butts, 9 Mass. 49.

In the case of *Mackenzie* v. *Flannery*, 90 *Ga.* 590, this court recognized that such a contract was lawful, when it held that a written contract providing for the payment of eight per cent. in advance by way of discount on short loans in the usual and ordinary course of business was not usurious. Interest from date is recoverable when it is stipulated that it shall be paid in the event the debt is not paid promptly at maturity, provided the interest has not already been included in the principal amount. Civil Code, § 2879. The facts of the present case do not bring it within the letter, reason, or spirit of the principle of any of the cases above referred to, where a rate of interest apparently higher than that authorized by law was allowed to be collected. Calculating interest at the highest lawful rate on the principal of the debt for the full period of the loan, and dividing the sum of this interest and the principal into notes of equal amount and in number equal to the months embraced in the period which the debt has to run, will undoubtedly result in the debtor's paying and the creditor's receiving more than the lawful rate of interest on the principal of the debt. To show that the contract in the present case is infected with usury it is only necessary to make a simple calculation. Had the interest been computed in the ordinary way, and had the plaintiff given notes of $63 each falling due monthly, she would have paid off the debt in a little less than fifty-one months. She owed interest on the entire principal but for one month, whereas she has contracted to pay interest on it for five years. The fact is that under the usury laws of this State she could not be required to pay eight per cent. interest for the full period of the loan on any sum but that represented by the last note to become due. Computing interest on $2,700 for one month and deducting $63 from the sum, and computing interest on the sum remaining for one month and

deducting $63, and so on, will show that the contract required the payment of about $578 in excess of the principal and interest at the highest lawful rate. Paying sixty-three dollars per month would have cancelled the debt before the expiration of five years; but had it been desired. that the loan should cover that period, and had a monthly payment sufficient to bring about this result been made, the aggregate sum required to pay off the debt would have still been considerably less than the amount due under this contract. In other words, if the plaintiff had divided the principal ($2,700) into sixty notes of $45 each, the first bearing interest at eight per cent. for one month, the second for two months, and so on, the aggregate amount paid in five years would have been much smaller than $3,780. It is clear, therefore, that there was a mutual intention on the part of the parties to this transaction to enter into a scheme which would result in the payment of more than eight per cent. on the one side and of receiving more than eight per cent. on the other. This intention could not have been more apparent if it had been expressed upon the face of the contract itself. This being true, the transaction has all of the elements of usury in it. A transaction is usurious when we find a loan either express or implied, and an understanding between the parties that the loan shall or may be returned with a greater rate of interest than is allowed by law. Tyler, Usury, 101–103. See also, in this connection, Falls *v.* Loan Co., 97 Ala. 417, s. c. 24 L. R. A. 174 ; Trust Company *v.* Krumseig, 71 Fed. Rep. 350, 77 Fed. Rep. 32, 19 Sup. Ct. Rep. 179; Baum *v.* Raley (S. C.), 30 S. E. Rep. 713 ; Swann *v.* Cor. of St. Paul (Minn.), 73 N. W. Rep. 165. That the transaction under consideration discloses a contract, contrivance, and device by which a rate of interest greater than eight per cent. per annum was intended to be reserved, charged, and taken, will not admit of serious question. It is said, however, that the act of 1888 allowing loan associations to make such contracts, and the act of 1889 permitting certain savings institutions to make similar contracts, as well as the presence of this power in the special charters granted to numerous banks in this State since the passage of the usury law of 1879, should be taken as legislative declara-

tions that such transactions are not usurious. We think the conclusion to be drawn from the fact that the General Assembly has seen fit to confer the power to make these contracts upon two classes of corporations and many single corporations by express enactments is, that that body was of the opinion that such legislation was necessary under the existing laws of the State, and that in its absence the power sought to be conferred would not exist. If this is the correct conclusion, the opinion of the General Assembly in regard to these transactions seems to be the same as that entertained by us—that they are infected with usury. If, however, the proper conclusion to be drawn from the legislative acts is as is contended for, that in the opinion of the General Assembly the transactions are not usurious, we are, for the reasons above stated, constrained to adopt the opposite view.

2. The transaction under consideration being, in our opinion, usurious if controlled by the general law of this State on the subject of interest and usury, the next question to be considered is whether the transaction can be upheld as being in conformity to the sections of the code hereinafter referred to. In 1888 the General Assembly passed an act which allowed building and loan and "other like associations" to lend money to persons not members of such associations and make contracts with them of the character under consideration in this case. That act is embodied in the Civil Code, and is as follows:

"§ 2388. All building and loan associations, and other like associations doing business in this State, are authorized to lend money to persons not members thereof nor shareholders therein, at eight per cent. or less, and to aggregate the principal and interest at the date of the loan for the entire period of the loan, and to divide the sum of the principal and the interest for the entire period of the loan into monthly or other installments, and to take security by mortgage with waiver of exemption or title, or both, upon and to real estate situated in the cities or towns and their suburbs in which said building and loan associations may be located.

"§ 2389. All contracts made and securities taken in ac-

cordance with this Article shall be valid for the full amount of principal and interest charged, and shall not be held usurious.

"§ 2390. Nothing in this Article shall be held to apply to any building and loan association heretofore incorporated, unless said association shall, by a vote of a majority of its stockholders, adopt the provisions of this Article as an amendment to its charter."

In 1889 the General Assembly made this law applicable to savings institutions of a certain character, the law of 1889 being now embraced in section 2391 of the Civil Code, as follows: "All the provisions of this Article are to apply to all savings institutions which pay interest to depositors, and whose deposits are not subject to check." The evidence in the record being sufficient, prima facie, to establish that the defendant corporation belonged to the class of savings institutions referred to in the section of the code just quoted, the question arises whether the sections above set out are valid and binding laws.

It is contended that this law is a special law dealing with a subject for which provision has already been made by an existing general law, that is, the law regulating the rate of interest allowed to be charged in this State, and declaring what contracts shall be inoperative as usurious. In *Mathis* v. *Jones*, 84 *Ga.* 804, Chief Justice Bleckley says, that one way of determining whether a law is general or special is to ascertain whether notice of an introduction of the law into the General Assembly would have to be advertised in any particular locality; and that another test would be whether such law should be embraced in the code. After quoting the clause of the constitution above referred to, he uses this language: "The generality here spoken of is territorial generality." On page 810 he says: "There is no way to convert a statute territorially general into one territorially special. It may be altered at will, save that whilst it has life it must live all over the State with equal vigor, and can be excluded from no nook or corner in which there is a subject-matter for its operation." A law therefore is a general law within the meaning of the constitution when it operates in every part of the State upon every

person or transaction embraced within its terms. In the case of *Adair* v. *Ellis*, 83 *Ga.* 464, it was held that "The law providing the means and manner of payment of the solicitor of the city court of Atlanta is a general law applicable to the subject-matter;" and that therefore a law providing that certain individuals who had been solicitors of the city court of Atlanta should be paid out of the county treasury insolvent costs, which they would otherwise not be entitled to receive, was a special law and for that reason void. The law first above referred to was held to be a general law notwithstanding it operated only in Fulton county, for the reason that it operated upon all persons coming within its terms. In *Bone* v. *State*, 86 *Ga.* 108, it was held that a statute providing for two sections of the superior court in counties which contained a city of ten thousand inhabitants was not unconstitutional. In the opinion Justice Blandford says: "The constitution requires *at least* two sittings of the superior court in each county, but does not prohibit more sittings to be held, nor does it prohibit two or more sections of the superior court presided over by different judges sitting at the same time, where the interest of the public requires the same to be done, so that justice shall not be denied to any one. Nor is it unconstitutional because it provides for this scheme only for counties containing large cities, the legislature having power to classify in general terms."

The act of the General Assembly providing for the establishment of county courts was held not to be a general law having uniform operation throughout the State, because it excepted 46 counties from its operation; and the act of 1879, which amended the original county court act, was held not to be such a general law, because it excepted Walton county by name, as well as counties in which city courts had been established. *Lorentz* v. *Alexander*, 87 *Ga.* 444. Justice Simmons in the opinion in that case says: "A law to be general under this section of the constitution must operate uniformly, throughout the whole State, upon the subject or class of subjects with which it proposes to deal." The local option liquor law of 1885 (Political Code, §§ 1541 et seq.) was held to be a general law providing for obtaining prohibition in the several counties of the

State, notwithstanding the fact that one section of the act declared that no election shall be held under the provisions of the law in any county where the sale of spirituous liquors is already prohibited by high license, local option, or other regulation, so long as these laws remain of force. The law was held to be general in its nature, because there was no county in the State to which it would not, in certain contingencies, be applicable. *Crabb* v. *State*, 88 *Ga.* 584. A statute prohibiting the sale of liquors within a radius of three miles of any church or schoolhouse was held to be a general law, notwithstanding it provided that it should not apply to sales made within the limits of incorporated towns and cities. *Butler* v. *State*, 89 *Ga.* 821. In 1890 the General Assembly passed an act which declared that, "In each and every county and district in this State, the boundary-lines of each lot, tract, or parcel of land in said counties and districts shall be, and the same are, hereby declared a lawful fence; *provided*, that this section shall not become operative in any county or district of this State, which has not heretofore abolished or removed fences either by a vote of the people or in pursuance of legal or illegal legislative action, unless by an election and in the manner provided for in" certain designated sections of the Code of 1882. Acts 1890–91, p. 69. The law just quoted was under consideration by this court in *Thomas* v. *State*, 92 *Ga.* 1; it being contended by the plaintiff in error in that case that the law was special and not general in its nature. It was held that it was a general law and not unconstitutional. Justice Simmons in the opinion says: "It operates generally throughout the whole State. Every county in the State may avail itself of the provisions of this act, and of the one of which it is amendatory. Whenever and wherever an election is held and fences are abolished by a vote of the people, this act applies. No county or section of the State is excluded from its operation. All that is necessary to put it in force in any county is to comply with the requirements of the acts of which it is amendatory. It is very similar in its provisions to the local option act which has been held by this court to be a general law and constitutional." An act of the General Assembly fixing the venue of justices' courts in

cities of this State having a population of more than 15,000 and designating times and places for holding court, which provided that justices of the peace and notaries public who are ex officio justices of the peace may hold their courts "at the same or different time or at the same or different place," was held not to violate that provision of the constitution which declares that justices of the peace "shall sit monthly at fixed times and places," or that clause which provides for uniformity in the "jurisdiction, powers, proceedings, and practice of all courts or officers invested with judicial powers (except city courts), of the same grade or class." *Brooks* v. *Mutual Loan Co.*, 95 *Ga.* 178. The question as to whether this was a general or a special law was not raised in that case, and the case is here cited simply to show that this court impliedly recognized the right of the legislature to classify subjects of legislation. An act of the General Assembly authorizing judges of the superior courts to call special terms to grant charters to corporations was, in *Branch* v. *Glass Works*, 95 *Ga.* 573, declared by Justice Lumpkin to be a general and not a special law. "It has uniform operation," said he, "throughout the State, and applies alike to all superior courts; but if in any sense it is a special law, we are unable to perceive that it covers any case for which provision had already been made by an existing general law." Chief Justice Simmons in *Mattox* v. *Knox*, 96 *Ga.* 403, thus defines a general law, and applies the definition in the case under consideration: " A general law, within the meaning of that clause of the constitution which declares that 'Laws of a general nature shall have uniform operation throughout the State, and no special law shall be enacted in any case for which provision has been made by an existing general law,' is a law which by its provisions purports to operate throughout the State, and, with reference to the particular subject or class of subjects with which it deals, to prescribe a uniform rule applicable alike to all of them; and a law which is general in its operation is not the less a general law because of the fact that at the time of its enactment there happened to be then existing a local law relating to the same subject and applicable in its operation to a particular locality."

In *Crovatt* v. *Mason*, 101 *Ga.* 246, it was held that "An act of the General Assembly which renders councilmen and aldermen of the cities and towns of this State incompetent to hold any other municipal office during the time for which they·were chosen, is not unconstitutional because by its terms such act is made applicable only to cities and towns of two thousand inhabitants or more; but the same is a general act, and as such is applicable to all towns and cities within the State falling within the designated class at the time of its passage, or which may do so thereafter." In *Sasser* v. *Martin*, 101 *Ga.* 447, the power of the General Assembly to classify subjects for legislation is dealt with in a very able and elaborate opinion by Justice Little, from which we quote the following: "To clothe a law with a general character, in contradistinction to a local character, it is not essential that it should affect every person, object, or thing in the State, nor operate territorially throughout the entire limits and in all parts of the State. In the State there exists a great variety of subjects of legislation, each requiring provisions peculiar to itself. Generic subjects may be divided and subdivided into as many classes as require this peculiar legislation. Thus laws relating to the people, for certain purposes, extend to all alike, as for protection of person and property; for other purposes they are divided into classes, as voters, sane and insane persons, minors, husbands and wives, parents and children. Property is subject to division into classes. Thus timber lands, arable lands, mineral lands, urban and rural lands may be divided into classes for various purposes. Nearly every matter of public concern is divisible, and division is necessary to methodical legislation. . . It is undoubtedly within the power of the legislature, for the purpose of exercising its legislative authority over the subjects thereof, to classify ad infinitum, and legislate with respect to each classification, without entering the realm of local legislation, with these limits, however, viz.: 1st. The classification must be natural, not arbitrary; it must stand upon some reason, having regard to the character of legislation of which it is a feature. . . 2d. The other limitation is, that the law must be coextensive with and operate uniformly upon the entire class to which it is applicable."

The same act which was under consideration in the case of
*Brooks* v. *Banking Co.*, supra, was again before this court in the
case of *Starnes* v. *Mutual Loan & Banking Co.*, 102 *Ga.* 597, when
it was held that that act was not in conflict with that clause of
the constitution which declares that "no special law shall be
enacted in any case for which provision has been made by an
existing general law." Presiding Justice Lumpkin in the
opinion says that the act is "general, and not special, because
it deals with all cities of a given population as a class. The
constitution recognizes several territorial jurisdictions, to wit:
the whole State, and whole counties, cities, and militia districts.
Whatever applies to all or any one of these territorial jurisdic-
tions as a *class* can not be called special, but should be treated
as general with regard to that class." The law embodied in sec-
tions 774–797(c) of the Code of 1882 (Civil Code, §§ 683–710)
was, in *Fullington* v. *Williams*, 98 *Ga.* 807, held not to be a gen-
eral law having uniform operation throughout the State, for the
reason that it did not apply "to any community, town or vil-
lage within one mile of the corporate limits of any city in this
State," and that for this reason a considerable portion of the
State was expressly excluded from the operation of the law;
Chief Justice Simmons in the opinion saying: "In order for a
law to be general under this clause of the constitution, it must
operate uniformly throughout the whole State, upon the sub-
ject or class of subjects with which it purposes to deal; and a
law is not general which expressly excludes from its operation,
as the section above quoted does, a considerable portion of the
territory of the State." The act of the General Assembly em-
bodied in section 4270 et seq. of the Civil Code, providing for
the establishment of a city court upon the recommendation of
the grand jury of any county having a population of ten thou-
sand or more, in counties where a city court does not then exist,
was, in *Thomas* v. *Austin*, 103 *Ga.* 701, held not to be a general
law having uniform operation "throughout the State," on the
ground that the statute excepted from its operation those coun-
ties in which city courts already existed. It clearly appears
from the opinion of Justice Lewis that the law then under con-
sideration was held not to be a general law having uniform

operation throughout the State, not for the reason that it was operative only in counties having a certain population, but because the exception of those counties in which a city court was established withdrew from the operation of the act twelve or thirteen of the largest counties in the State, which could never, under the terms of the statute, fall within its operation.

While the question now under consideration was not directly involved in the case of *Cook* v. *Loan Association*, 104 *Ga.* 814, some of the language used by Justice Lewis in the opinion in that case is pertinent to the present discussion. After referring to section 2401 of the Civil Code, which is in substance as follows: No fines, interest or premiums paid on loans in building and loan associations shall be deemed usurious, and may be collected as other debts are collected and according to the agreement between the association and the borrower, he says: "It is insisted by counsel for plaintiff in error that this act is unconstitutional, in that it seeks by special law to enact certain things for which provision has been made by an existing general law. It is contended that the legislature can not pass a general usury law, and afterwards exempt by special legislation a certain class from its operation. We do not think the statute obnoxious to this provision in the constitution. It was not intended to legalize a charge of usury by a building and loan association. In fact the legislature simply declared to be law what this court had previously decided was law. Besides, speaking for myself, I think that advances made by a building and loan association to its members differ so materially from other loan transactions that it was perfectly competent for the legislature to place them in a separate class for the purpose of regulating questions of usury and interest. Even if the act in question can be considered as special legislation, it contains nothing for which provision has been made by an existing general law. As before indicated, the general law in the State on the subject of usury has no application to transactions of this sort by building and loan associations. But we do not think this section of the code above quoted either a local or a special law. It is certainly not local, for it is confined to no locality, but extends in its operation throughout the State.

It is not special, because it embraces all citizens of the State, and gives to every person who may conform to its requirements the same rights and privileges."

The power of the legislature to classify subjects for legislation has been under consideration in a number of cases in different States of the Union, and the current of authority is undoubtedly in favor of the view that such power exists. In addition to the authorities cited by Justice Little in the opinion in *Sasser* v. *Martin*, supra, the following are some of the many decisions and text-books dealing with this subject: Cooley's Con. Lim. 153 (note); Caruthers *v.* Andrews, 2 Cald. (Tenn.) 378; McAunich *v.* Railroad Co., 20 Iowa, 338; Pritchett *v.* Stanislaus, 73 Cal. 310; Jackson *v.* Shawl, 29 Cal. 267; Kilgore *v.* Magee, 85 Pa. St. 401; Daniels *v.* Henshaw, 76 Cal. 436; Wheeler *v.* Phila., 77 Pa. 338; Walker *v.* Potter, 18 Ohio St. 85; State *v.* Pugh, 43 Ibid. 98; State *v.* Hudson, 44 Ibid. 137; State *v.* Smith, 48 Ibid. 211; Henderson *v.* Onahan, 48 N. E. (Ill.) 1003. It is unnecessary to multiply authority on this point, as the cases cited above from this court show that from a very short time after the adoption of the constitution of 1877 until the present time the right of the General Assembly of Georgia to classify subjects for legislation has been recognized and does not seem ever to have been seriously doubted.

It remains now for the principles above referred to to be applied to the facts of the present case. When so applied, is the law under consideration a special law, and therefore inoperative because unconstitutional and void? Or, is it a general law because it operates equally upon all persons within the territorial limits of the State who can be brought within the sphere of its operation? The reasoning in the authorities above cited clearly demonstrates that it is not only within the power of the General Assembly to classify subjects for legislation, but that in many instances it is not only wise but necessary for the public good that there should be a classification. Of necessity, all laws can not bear equally upon all natural persons. Such persons have been always subject to classification for purposes of legislation. One class is composed of those who are supposed to be able to protect themselves, as are all persons sui

juris who labor under no disability; another class is composed of those who are supposed for some reason not to be able to take care of themselves, as infants, persons imprisoned, and others laboring under disabilities of like character. A general law regulating the conduct of persons sui juris and operative upon every person within that class may coexist in the same territory with a general law operative only upon infants. Artificial persons — mere creatures of the law — are of necessity required to be formed into classes, in order that there may be intelligent legislation regulating the powers and disabilities of these creatures of the law. Rules which would be appropriate to railroad corporations might not be necessary or proper in the case of banking corporations. It might be wise to impose upon ordinary railroad corporations certain duties and responsibilities which it would be unwise and unjust to require of street-railway companies. Duties and liabilities might be imposed upon one class of street-railway corporations, when it would not be wise or just to impose them upon another. The dangers to the general public as well as to passengers growing out of the use of steam or electricity in propelling cars upon the streets of a city would be a sufficient reason for placing street-railway companies of this class in a different class from those propelled by animal power, so far as rules in regard to speed etc. are concerned. This being true in regard to this particular class of corporations, and such a classification not being arbitrary but being founded in reason, other corporations created for the public convenience, to a large extent, may be subdivided into classes for the purposes of legislation, if the subdivision is founded upon any good reason. Banks may be divided into banks of issue and banks not of issue. Banks which do not pay their depositors interest on deposits may be separated for purposes of legislation from those which do. A bank which holds its depositors' funds subject to check is of a different species from a bank which holds the money of its depositors not subject to be drawn out by check. Each class of banks referred to occupies a position in the commercial world peculiar to itself. Each supplies in its peculiar way demands which can not be supplied by banks of any other class.

Such being the case, it is proper for the General Assembly to provide laws operating uniformly upon all members of the class, which will facilitate the object for which each class is formed. A savings bank which pays interest on deposits, and which holds the money of the depositor subject only to be drawn by surrender of the pass-book and not subject to check, occupies a relation in the financial world peculiar to itself. It is intended as a safe depository of him who desires to place his savings in the hands of some one who will keep them, and hold them not subject to the demand check to which funds in banks of simple deposit are always subject. To a large extent, both their depositors and borrowers are men of small earnings and small savings. They come in contact with and supply the financial wants of the wage-earner whose income is generally daily, weekly, or monthly. Being institutions organized for the purpose of earning money for their depositors as well as for their stockholders, in order to facilitate their business with the class of people most apt to resort to them it was deemed wise by the General Assembly to place such institutions in a class that would be allowed to make contracts whereby the individual of small means, living upon a salary perhaps, could secure a loan upon terms of repayment that could be most conveniently met by him. Such contracts would not bear too heavily upon the borrower and would be the means of securing a reasonable profit to the lender in the transaction. It is true that the arrangement contemplates the payment of a higher rate of interest than that allowed under the law applying to other corporations and private individuals in similar transactions. But if in the opinion of the General Assembly it is wise to allow this class of corporations to charge this higher rate of interest, it is not within the power of the courts to destroy this classification, unless it is manifest that it is purely arbitrary and founded upon no reason whatever. It might be that the reasons which moved the General Assembly in making the classification would not be entirely satisfactory to our minds as individuals; but no successful attack upon the law can be made unless it be shown that the classification is so unsupported by any reason whatever as to make it arbitrary

and capricious. This has not been made to appear in the present case. All presumptions are in favor of the constitutionality of the law. The members of the General Assembly that passed this law were under oath to support the same constitution which our official oath requires us to obey. Whenever there is doubt as to whether the General Assembly has gone beyond the limits fixed by the constitution for its guidance, the invariable rule is that courts must give the benefit of the doubt to the General Assembly and hold the act constitutional. Applying the well-settled rules which must control when the constitutionality of a law is under consideration, we are forced to the conclusion that we would not be justified in declaring that the General Assembly has exceeded its power in passing the act in question. See, in this connection: Holmes *v.* Smythe, 100 Ill. 413; Freeman *v.* Building Association, 114 Ill. 182; Wright *v.* Building Association, 128 Ill. 67.

3. While the Union Savings Bank & Trust Company is authorized by its charter to engage in a general banking business and exercise other powers in addition to those connected with the operation of a savings institution pure and simple, it does not appear from the present record whether it is actually engaged in any other business than that usually carried on by savings institutions of the character referred to in the act of 1889, that is, savings institutions which pay interest to depositors and whose deposits are not subject to check. Whether the act of 1889 was intended only to apply to banks whose business was limited to that carried on by saving institutions of the character named in the act, or whether the act was intended to apply to banks which could be properly declared to be savings institutions, but whose operations were not limited solely to such business, is a question not raised in the present record and one which we will not now decide.

4. The charter of the Union Savings Bank & Trust Company confers upon it in express terms the power to "lend money on any security agreed on, and for any period of time, at any rate of interest not exceeding the highest contract rate allowed by law, and to aggregate the principal and interest for the whole period of the loan at the date of the loan and collect

the same by monthly or other installments, as may be agreed on with the borrower, without rebate or reduction, *provided,* not more than the legal rate of interest shall be charged; and to take therefor security by deeds, or mortgages, or otherwise; and such contracts and securities shall be valid and binding for the full amount of principal and interest charged, and shall not be held to be usurious." It was argued that this provision in the charter was inoperative, because the legislature had no power to confer upon a single bank the authority to do that which is prohibited by a general law in existence and operative at the time that the charter was granted. This position seems to be well taken, but under the view we take of the present case it is not necessary to decide this question.

*Judgment reversed. All the Justices concurring, except*

SIMMONS, C. J., dissenting. The constitution of this State provides that no special law shall be enacted in any case for which provision has been made by an existing general law. There being a general law regulating the rate of interest to be charged on loans by persons and corporations, the General Assembly has no power to enact a law authorizing one bank or class of banks, which receive deposits not subject to check and pay interest thereon, to charge a higher rate of interest than other persons or banks. Such a law is special and prohibited by the constitution, and is not made a general law by the fact that the banks are classified as above indicated. Such a classification would be arbitrary and unreasonable.