Gerald J. LINDENBERG, David M. Green and Ouida S. Green, on behalf of themselves and all other persons similarly situated, Plaintiffs,

v.

FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION and Fulton Federal Savings and Loan Association, on behalf of themselves and all other federal savings and loan associations similarly situated, Defendants.

Civ. A. No. C80–983A.

United States District Court,
N. D. Georgia,
Atlanta Division.

Dec. 8, 1981.

Joseph Lefkoff, Jerry L. Sims, Lefkoff, Pike, Fox & Sims, P.C., Atlanta, Ga., for plaintiffs.

Trammell E. Vickery, James A. Gilbert, Hansell, Post, Brandon & Dorsey, Henry M. Hatcher, Jr., Thomas Hal Clarke, Paul H. Anderson, Mitchell, Clarke, Pate, Anderson & Wimberly, Atlanta, Ga., for defendants.

## ORDER

ROBERT T. HALL, District Judge.

High interest rates and an uncertain economy over the past several years have lead to well publicized strains on the housing market. This is one of a growing number of cases around the country challenging the home mortgage lending practices of federally chartered banks and thrift institutions during this unsettled period.[1]

Plaintiffs in this action are home purchasers, defendants are mortgagees of the purchased properties. On February 2, 1981, the court granted the defendants' motions for summary judgment on the causes of action based on the Georgia Assumption Statute, Ga.Code Ann. § 67–3002, contained in Counts II, III and V of the plaintiffs' amended complaint. 90 F.R.D. 255 (N.D. Ga.1981). On May 26, 1981, the court denied the plaintiffs' motion for reconsideration of the summary judgment order. *Id.*

The case is presently before the court on cross-motions for partial summary judgment on the plaintiffs' allegations of usury, contained in Count IV of the amended complaint. Although the background of the case has been given in the court's prior orders it bears a summary repetition.

## I. FACTS

On March 30, 1977, defendant First Federal Savings and Loan Association ("First Federal") made a residential purchase loan to Mr. and Mrs. Perry Childers. The loan was evidenced by a note, providing for interest at the rate of 8.75% per annum, and was secured by a deed to secure debt to the residence. At the time, the maximum lawful interest rate on home loans was 9% under Georgia law.

Shortly thereafter, the Childers sold the property to Charleen Ernst who assumed the loan. On December 31, 1979, Ernst sold the property to the plaintiff, Gerald Lindenberg. Pursuant to the sale, First Federal, Ernst and Lindenberg entered into a Loan Modification and Assumption Agreement ("the Lindenberg Loan Modification") whereby First Federal released Ernst from future liability on the loan, and Lindenberg agreed to assume the loan at an increased interest rate of 10.75%.

In a similar series of transactions, on March 9, 1979, defendant Fulton Federal Savings & Loan Association ("Fulton Federal") made a residential purchase loan to Mr. and Mrs. Horace Smith. The loan was evidenced by a promissory note providing for interest at the rate of 9.75% per annum, and was secured by a deed to secure debt on the residence. At the time, the maximum lawful interest rate on home loans was 10% under Georgia law.

On May 8, 1980, the Smiths sold the property to plaintiffs David M. and Ouida S. Green. Pursuant to the sale, Fulton Federal the Smiths and the Greens entered into a Loan Modification and Assumption Agreement ("the Green Loan Modification") whereby Fulton Federal released the Smiths from future liability on the loan, and the Greens agreed to assume the loan at an increased interest rate of 12%.

In both the Lindenberg and Green loan modifications no new note or security deed was signed.

## II. POSITIONS OF THE PARTIES

The plaintiffs contend that the usury limitations applicable to the loan modifications in this case are the limits which were in effect at the time the loans were originally made, rather than the limits in effect at the time of the modifications. Accordingly, they claim that the loan modifications are usurious.

Plaintiffs begin with the proposition, not contested by the defendants, that the appli-

1. *See* W. Dunn and T. Nowinski, *Enforcement of Due-On-Transfer Clauses: An Update,* 16    Real Property, Probate and Trust Journal 291 (1981).

cable usury limitation in effect in the place, and at the time, a loan is made, remains the applicable limitation throughout the life of the loan, without regard to whether usury limits are subsequently changed. Ga.Code Ann. § 57–106; *Lankford v. Holton,* 187 Ga. 94, 200 S.E. 243 (1938). *See also Layton v. Liberty Loans of Waycross,* 152 Ga.App. 504, 263 S.E.2d 167 (1979). However the parties disagree sharply as to what the origination dates of the loans to the plaintiffs were.

The plaintiffs argue that because they merely assumed liability for loans previously made to other parties that the controlling origination date of the loan to them is the same as the origination date of the loan to their grantors. The heart of each plaintiff's position is that despite any modification in the terms of their loan, there was only one loan and hence, only one origination date.

The defendants concur that the debts for which the plaintiffs agreed to become liable came into existence only once—when the plaintiffs' grantors first purchased their properties. However, the defendants maintain that the origination date of the *loans to the plaintiffs* could only be at the time of the modification agreements. Defendants also contend that any state usury issue presented by this case is preempted by Pub. L.No.96–161, § 105, 93 Stat. 1233 (1979).

In support of their claims that there were single loans, each with one origination date, the plaintiffs refer to the text of the loan documents and modification agreements as well as the procedures used in effecting modifications. The plaintiffs place greatest emphasis on covenant 24 of the deeds to secure debt.[2] This covenant provides that: "Assumption Not A Novation. Lenders acceptance of assumption of the obligations of this Deed and the Note and the release of Borrower pursuant to paragraph 17 hereof shall not constitute a novation." Fulton Federal's loan modification agreement also provides that the assumption is not a novation.

Further, both modification agreements provide that plaintiffs assume and agree to abide by all provisions of the original obligations, that the modifications only relate to interest, and that the lenders will transfer the indebtedness from the name of the seller to that of the buyer. Finally, the plaintiffs point to the fact that no new money was advanced, that no new notes were signed and that no new deeds to secure debt were executed.

The plaintiffs' most compelling argument concerns the meaning of covenant 24. According to the plaintiffs, the fact that the loan assumptions were not novations has a simple effect: As a matter of law, since the loan assumptions were not new loans, the old loans continued in effect until the expiration of their 30-year term. The plaintiffs contend that covenant 24 was inserted by the defendants for the purpose of their protecting their security interest. The plaintiffs maintain that in the absence of covenant 24, the loan modifications could be found to be novations, and that the defendants' security interest would be jeopardized. They conclude that the defendants cannot accept the benefits of the covenant for the purpose of protecting their security, but ignore the covenant or construe it away as boilerplate, when the plaintiffs assert its provisions for their benefit.

It is elementary that on a motion for summary judgment the moving party bears the burden of showing both the absence of a genuine issue as to any material fact and

2. In order to sell their mortgages to the Federal Home Loan Corporation ("FHLC"), savings and loan institutions must use a prescribed deed to secure debt. Because secondary market sales through FHLC are vital to the health of savings and loans, the prescribed deed to secure debt is used virtually without exception.

Covenants one through seventeen of the deeds are uniform throughout the nation (except in New York which uses a plain language variant). Non-uniform covenants are added on a state by state basis upon the recommendation of FHLC's local counsel. Although questions of novation, security and usury are common to all fifty states, apparently only Georgia uses non-uniform covenant 24. The importance of the deeds to secondary market sales and Georgia's unique inclusion of covenant 24 hightened the court's attention to the plaintiffs' arguments on that topic.

that judgment is warranted as a matter of law. Also, the evidence on the motion must be construed in favor of the party opposing the motion, and the opposing party must receive the benefit of all favorable inferences that can be drawn from the evidence.

The court has carefully considered the plaintiffs arguments. However, even taking all facts in a light most favorable to the plaintiffs, and drawing all inferences that can reasonably be drawn in their favor, the court concludes as a matter of law, that the defendants have not charged a usurious rate of interest. Accordingly, for the reasons set forth below, the plaintiffs motion for summary judgment is DENIED and the defendants' motion for summary judgment is GRANTED.

## III. DISCUSSION

### A. Novation

The plaintiffs pose a dilemma for the defendants and the court. They argue that if the modifications in the instant case are new contracts, for valid consideration, and establish a new origination date for usury, then there must have been novations which destroyed the defendants' security interests in the mortgage property. Conversely, if there were no novations, the relevant origination dates were the same as those of plaintiffs' grantors.

The dilemma plaintiffs assert is false. There are middle cases between the two extremes of a novation, extinguishing the old contract and its security in its entirety, and an assumption of liability, that merely adds a new party as principal debtor with no changes in the origination date or other terms. Compare cases on novations or assumptions, *e.g.*, *Knight v. First Federal Savings & Loan*, 151 Ga.App. 447, 260 S.E.2d 511 (1979) (novation occurred) and *Chewning v. Huebner*, 142 Ga.App. 112, 235 S.E.2d 573 (1977) (novation occurred) and *Cowart v. Smith*, 78 Ga.App. 194[1], 50 S.E.2d 863 (1948) (mere assumption not novation) with cases on modifications, *e.g.*, *Williams v. Rowe Banking Co.*, 205 Ga. 770, 55 S.E.2d 123 (1949) (new contract but no novation) and *Contractors Management*

*Corp. v. McDowell-Kelley, Inc.*, 136 Ga.App. 116[4], 220 S.E.2d 473 (1975) (modification). *See also* Ga.Code Ann. 20–119.

There are a host of doctrines which justify and explain how, once a contract is made between certain parties, either the contract, or the parties which it binds may be changed. These doctrines, including novation and assumption, as well as modification, substituted agreement, accord and satisfaction, recision, and assignment, all have distinct core meanings recognized by the great contract treatises. *See* A. Corbin, Contracts (1951); Restatement (Second) of Contracts (1981), Restatement of Security (1941); S. Williston, Contracts (1957); *See also* 58 Am.Jur.2d, Novation § 2 (1971). The treatises concede that in practice, the cases evidence more confusion than clarity in deciding what label to apply to certain transactions, and what consequences flow from the application of particular labels. *See, e.g.*, 6 A. Corbin, Contracts § 1293 (1951).

Nonetheless, from the plethora of doctrines governing changes in the parties or terms of preexisting contracts, it is self-evident that although every novation involves a new contract, not every new contract involves novation.

"Novation" is a term of art. It signifies a very particular type of accord or modification. "A novation is a complete contract within itself and has four essential requisites: (1) a previous valid obligation, (2) the agreement of all of the parties to the new contract, (3) the extinguishment of the old contract, (4) the validity of the new one." *Sutton v. General Electric Credit Corporation*, 154 Ga.App. 522, 268 S.E.2d 789 (1980). There must be a mutual intent to create a novation. *Mayer v. Turner*, 142 Ga.App. 63, 234 S.E.2d 853 (1977). The loan documents in the instant case make clear no novation was intended.

The very language of the four-part test for a novation indicates the possibility excluded by plaintiffs, of a transaction which creates a new contract without completely extinguishing the old contract or any debt

it may have created. The terms of the loan instruments, including covenant 24, which plaintiffs advance in support of their position, simply demonstrate that the substitutions which took place here were structured to protect the defendants' security interests. Although not a novation, the transactions involved here clearly resulted in new contracts, binding on defendants as well as plaintiffs, the validity of which is to be judged at the time of their making. *See Story v. Kimbrough*, 33 Ga. 21 (1861).

The issue of novation may be relevant to the extent that had a novation occurred, the plaintiff's concede that the usury rate would be determined by the loan modification dates. The fact no novation occurred also may be significant to a mortgagee interested in protecting its security interest. But it does not follow that the absence of a novation is determinative of the origination dates of the loans to the plaintiffs.[3]

### B. Origination Dates

Although certain facts of this case are unique, the general issue presented—determining applicable usury rates after a change in the usury law—is not unprecedented. In 1755 the Governor Counsel and Assembly of the province of Georgia passed an act setting the usury limit at 10 percent, twice the statutory rate in Great Britain. Between 1755 and 1879 maximum usury rates were lowered four times and raised two times. The rates then remained unchanged until 1969 when the legislature established a separate usury rate for real estate loans and set that rate at nine percent. This rate was raised to ten percent in 1977 and made variable in 1979. *See generally Union Savings Bank v. Dottenheim*, 107 Ga. 606, 34 S.E. 217 (1898), 18 Ency.Ga.Law, Interest § 2 (1981).

The court has researched cases from the period of each increase in maximum usury limits. Noteworthy are the cases [4] concerning the period from 1873 to 1875 when the legislature removed all limits on written agreements pertaining to interest charges.

The cases consistently hold that contracts entered into under one usury statute remain enforceable on their original terms even if the statute changes. By contrast, any contract entered into after changing the law is to be governed by the new law, even if the new contract concerns a preexisting debt. *See, e.g., Taylor v. Thomas*, 61 Ga. 472 (1878).

Indeed, even if an original loan contract was void for usury, a new promise to pay the loan after an increase in the usury limits was binding under the new limits. *Houser v. Planters Bank of Fort Valley*, 57 Ga. 95 (1876). In the instant case, the plaintiffs' promise to pay the remaining

---

**3.** In fact, ordinarily, novation is raised as a defense to payment of a debt, either by the original borrowers or the substituted borrowers. The typical discussion of novation equates release from liability with novation and the effect of novation on the lender's security is not discussed. *See, e.g.,* 58 Am.Jur.2d Novation (1971). Accordingly, the court found inclusion of covenant 24, baffling and intriguing.

Upon satisfaction of the obligation for which a security deed is given, the deed is automatically extinguished. *Hennessy v. Woodruff*, 210 Ga. 742, 82 S.E.2d 859 (1954). Apparently the FHLC inserted covenant 24 because of a belief that a novation, by extinguishing a party's liability for a debt, would extinguish the debt as well. *See Trusco Finance Co. v. Southern Cotton Oil Co.*, 76 Ga.App. 199, 202, 45 S.E.2d 291 (1947). The basis for this belief is murky in transactions where the obligation does not change and one party is substituted for another, with notice of a recorded deed securing the debt assumed. *See* 20 Ency.Ga.Law, Mortgages § 42 (1981); *Williams v. Rowe Banking*, 205 Ga. 770, 55 S.E.2d 123 (1949). The FHLC local counsel who wrote covenant 24 shed no light on the authority for its belief that covenant 24 was necessary.

In light of FHLC's attempt to limit non-uniform covenants in the drafting of the deeds the court felt the unique covenant 24 might hold some special meaning. Apparently, it means only what it says, and this is of uncertain utility.

**4.** *Reynolds v. Neal*, 91 Ga. 609, 18 S.E. 530 (1893); *Vines v. Tift*, 79 Ga. 301, 7 S.E. 227 (1888); *Bullard v. Jones*, 68 Ga. 472 (1882); *Williams v. Griffin Banking Co.*, 64 Ga. 178 (1879); *Tummons v. Hamilton*, 64 Ga. 137 (1879); *Taylor v. Thomas*, 61 Ga. 472 (1878); *Wilkinson v. Wooten*, 59 Ga. 584 (1877); *Neil v. Bunn*, 58 Ga. 583 (1877); *Houser v. Planters Bank*, 57 Ga. 95 (1876); *Shealy v. Toole*, 56 Ga. 210 (1876).

portion of their grantors' debt must be judged at the time of their promise.

Plaintiffs object that the cases cited concern renewals of notes already passed their maturity and are from a period when there was no maximum interest charge on written contracts. These are differences without a difference. First, in holding new, post-usury change contracts valid as of the time they were made, the cases focus on the presence of new consideration. *See, e.g., Neil v. Bunn*, 58 Ga. 583 (1877). Post-maturity extension of time for repayment is the most likely consideration for a new contract in a two-party loan transaction. *But see Citizens & Southern National Bank v. Scheider*, 139 Ga.App. 475, 228 S.E.2d 611 (1976) (extension not consideration for post-maturity renewal). However, forebearance is not the only valid consideration for a new contract on a preexisting debt. Where three parties are involved, release of the original borrower and acceptance of a purchaser-grantee is valid consideration for a new contract at new interest rates, even before expiration of the original loan term.

Second, despite the broad language of the cases, the legislature had not ended all regulation of interest rates during the relevant period. It had merely provided for unlimited interest rates in written contracts. The rate otherwise was 7 percent. 1873 Georgia Laws 52. Whether the "legislative will" sanctions interest rate limits of 10 per cent or infinity is immaterial, so long as the challenged rate is below the sanctioned maximum. Finally, as indicated below, the *loan modifications in this case were covered by the Federal preemption of state usury limits*, Pub.L. 96–161.

### C. Claim of Usury Personal

■■ So long as the original borrowers are liable for a debt, they have a vested right in having interest rates remain at the rate expressed in the original promissory note for the debt. By the same token, the lender has a vested right to hold the original borrowers liable for repayment of the debt; assumption of the debt by another can not release the borrowers from liability without the express consent of the lender. *Federal Deposit Insurance Co. v. Thompson*, 54 Ga.App. 611, 188 S.E. 737 (1936).

■ A plea of usury is personal. Ga. Code Ann: 67–103. Because the usury laws protect the debtor, not the debt, the parties' various rights concerning the debt belongs to them only so long as they remain within a lender-borrower relationship. The parties are free to bargain away their rights and once the borrower is released from liability, whether by novation, a loan modification or any other means, subsequent agreements for repayments of the debt are governed by the laws as of the date they are made, and not the date of the creation of the debt.

Conversely, before the sales by the original borrower-grantors, the plaintiff-grantees were total strangers to the loan agreements. Their protection under the usury law can only begin when liability for the debt is transferred to them. If the grantors were not released from liability, the grantees' rights might be derivative. But this was not the case here.

Under the plaintiffs' reasoning a modified interest rate above a preexisting maximum legal rate could *never* be achieved accept by a novation that would create a new debt and a new security interest for the lender. The transfer of liabilities and renegotiation of the terms for their repayment in light of new market conditions, a practice widespread throughout the marketplace, would be severely circumscribed. This is not the law in Georgia.

### IV. APPLICABLE USURY RATE

■ Having concluded that the loan modifications in the instant case were new contracts to be governed by the laws in effect at the time those contracts were made, the only remaining issue is what the effective usury limits were on the loan modification dates.

The applicable limits under state law were established by Ga.Code Ann. § 57–101.1, as amended. 1979 Georgia Laws 357. However, Congress preempted the state statutes by passage of Public Law 96–161.

In passing this law Congress expressed an unmistakable intent to preempt state usury laws. *See Alessi v. Raybestos-Manhatten, Inc.*, 451 U.S. 504, 519–522, 101 S.Ct. 1895, 1904–1905, 68 L.Ed.2d 402 (1981); *Jones v. Rath Packing Co.*, 430 U.S. 519, 525–26, 97 S.Ct. 1305, 1309–1310, 51 L.Ed.2d 604 (1977). Public Law 96–161 provides that state usury laws do not apply to certain residential mortgage loans made. between December 28, 1979, and March 31, 1980. Unless a state specifically overrides these provisions, Public Law 96–221, § 501, 94 Stat. 132, extends this preemption from April 1, 1980 on.

The parties do not dispute that Pub.L. 96–161 and Pub.L. 96–221 were valid exercises of Congressional power to preempt state legislation. Further, the loan modifications occurred after the effective date of the federal preemption.

By its own terms, Pub.L. 96–161 only applies to loans made after its effective dates. Pub.L. 96–161 § 105(a)(1)(B) *See also* 45 F.R. 1853 (Jan. 9, 1980); 45 F.R. 6166 (Jan. 25, 1980). In an argument parallel to their state usury claims, the plaintiffs maintain that the preemption did not apply to them, because the loans for which they are liable were originally made before the effective dates of the preemption statutes. This position is without merit.

For purposes of the preemption statutes, the Home Loan Bank Board has interpreted a loan assumption, accompanied by release of the grantor and an increase in the interest rate, as constituting a new loan regulated by the statutes. Federal Home Loan Bank Board Interpretation No. 590–2 (Assumptions) 45 F.R. 6166 (Jan. 25, 1980). Although not required to give effect to an interpretative regulation, "when faced with a problem of statutory construction, this court shows great deference to the interpretation given the statute by the officers or agency charged with its administration." *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct.

792, 801, 13 L.Ed.2d 616 (1965); *Roy Bryant Cattle Co. v. United States*, 463 F.2d 418, 420 (5th Cir. 1972). *Cf. General Electric Co. v. Gilbert*, 429 U.S. 125, 141–145, 97 S.Ct. 401, 410–412, 50 L.Ed.2d 343 (1976) ("Varying degrees of deference are accorded to administrative interpretations...") The courts own analysis, set out above in section III, confirms the correctness of the Bank Board's position.

## V. PUBLIC POLICY

In its report on permanent federal preemption of state usury laws, the Senate Banking, Housing, and Urban Affairs Committee stated the purpose of preemption as being "to ease the severity of the mortgage credit crunches of recent years ... " The committee believed that preemption would "enhance the stability and viability of our nation's financial system and is needed to facilitate a national housing policy and the functioning of a national secondary market in mortgage lending." S.Rep.No. 96–368, 96 Cong., 2nd Sess. 18, reprinted in 1980 U.S.Code Cong. & Ad.News 834, 852.

The public policy of Georgia is manifestly in harmony with the policy considerations which motivated the Congress in its preemption of state usury laws. A review of the legislative history of Pub.L. 96–161 and Pub.L. 96–221, relevant portions of 12 C.F.R., and other cases challenging mortgage lending practices around the country reveals the following facts: [5]

Mortgage lenders typically carry large portfolios ("pools") of mortgages, comprised of the outstanding mortgages issued over many years of lending. So long as interest rates vary predictably or only over a narrow range lenders can adjust their lending rates so there is a positive spread between market interest rates and the weighted averages of the mortgages in their pool. However, in periods of rapidly escalating or volatile interest rates lenders with pools consisting of long term, fixed rate mortgag-

---

5. *See, e.g., Glendale Fed. Sav. & Loan Ass'n v. Fox*, 459 F.Supp. 903 (C.D.Cal.1978), *rev'd on other grounds*, Memorandum Order 663 F.2d 1078 (9th Cir. Sept. 25, 1981). *See also, Inter-* *est Rate Escalator Clauses*, 60 ALR 3d 473 (1974); *Increase of Interest on Transfer of Mortgaged Property*, 92 ALR 3d 822 (1979); P. Goldstein, Real Estate Transactions (1980).

es may face large negative spreads. This is so because lenders have primarily only three ways to adjust market-pool spreads: (1) to issue new loans at market rates (2) to call in old loans and (3) to offer short term or adjustable rate mortgages (ARM) instead of long term, fixed rate mortgages. Obviously these methods will be used in combinations as well as singly. For example, a combination of methods 1 and 2 is at issue in the instant case.

These three methods of adjustment are subject to regulation primarily through laws relating to usury or due on sale clauses. In particular, if usury laws prohibit issuing new loans at market rates none of these methods can be usefully employed. Moreover, lenders restricted to mortgage lending below market rates cannot participate successfully in secondary mortgage market auctions which facilitate new loans.

Even where usury laws permit lending at market rates, in periods of rapid interest rate escalation, adjusting the average pool rate is difficult because only a small proportion of loans are made at the new, higher rates. Obviously, if lenders' spreads remain negative over the long term lenders cannot continue in the business of making residential purchase loans.

Since 1969 Georgia has consistently taken steps to adjust usury laws and other regulatory policies to promote a stable and active residential mortgage lending industry. When a special category of usury restrictions for real estate loans was first established the legislature took cognizance of the fact that if usury limits are below market rates for money the funds necessary for economic activity will not be made available. 1969 Ga.Laws 33, 34.

This recognition has remained constant and has evidenced itself in a variety of contexts. See Ga.Code Ann. 57–101.1(c)(5) (VHA, FHA loans exempt from usury laws); 57–118 (for profit corporations exempt); 57–119 (loans greater than $100,000 exempt) 1977 Ga.Laws 1221 (raising real estate usury rate); 1979 Ga.Laws 357 (floating real estate usury rate). Further, the Georgia courts have been receptive to

instances of federal preemption of state usury laws made in order to insure the availability of funds. See *Kennedy v. Brand Banking Co.*, 245 Ga. 496, 266 S.E.2d 154 (1980) (effectiveness of federal preemption of usury laws for federally insured state banks' business or agricultural loans of $25,000 or more); *Christian v. Atlanta Army Depot Federal Credit Union*, 140 Ga. App. 277, 231 S.E.2d 7 (1976) (federal savings and loan exempt from state usury laws).

Nor does the Georgia Assumption Statute, Ga.Code Ann. 67–3002, conflict with Georgia's long standing policy in this area. The scheme under section 67–3002 attempts to restrict loan modifications made in connection with due-on-sale clauses and thereby blocks a traditional method of adjusting mortgage pool rates. However, it does not necessarily limit a lender's ability to adjust market-pool spreads because it was: totally prospective in operation; coupled with a floating usury rate; and accompanied by changes in the traditional long term, fixed rate lending practices.

Because the loans to plaintiffs' grantors are below prevailing rates they represent a potential loss to the defendants and an attractive opportunity for profit to the plaintiffs. Plaintiffs claim that one aspect of Georgia's public policy towards mortgage lending practices is to facilitate residential home purchases. They state that in accord with this policy, the immediate effect of allowing plaintiffs to expropriate the benefits of their grantors' loan terms would be to facilitate home purchases for the plaintiff class. The plaintiffs neglect to point out, however, that the cumulative effect of such expropriations over all classes of home buyers, and over several years, would be either to destabilize the lending market or to subsidize "loan assuming" purchasers at the expense of "non-assuming" purchasers. This is not the public policy of Georgia.

For all the above stated reasons plaintiffs motion for summary judgment is DENIED, the defendants' motion for summary judgment is GRANTED. The defendants' motions for a hearing is DENIED.