The BANK OF NEW YORK, Plaintiff,

v.

Russell L. HOYT, R. Perry Harris, Herbert L. Finley, Radcliffe L. Romeyn, Jr., Defendants.

Civ. A. No. 84–0659–S.

United States District Court, D. Rhode Island.

Aug. 28, 1985.

Edwards & Angell, Knight Edwards, John D. Deacon, Jr., Jeffrey C. Schreck, Providence, R.I., for plaintiffs.

Winograd, Shine & Zacks, P.C., Allen P. Rubine, Moss Patashnik, Providence, R.I., for defendant Hoyt.

Boyajian, Coleman & Harrington, John Boyajian, Alden H. Harrington, Providence, R.I., and Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., John M. Connolly, Stephen R. Goldstein, Elizabeth B. Burnett, Jack G. Stern, Boston, Mass., for defendant Harris.

Letts, Quinn & Licht, P.C., Joseph DeAngelis, Robert D. Fine, and Levy, Goodman, Semonoff & Gorin, Providence, R.I., for defendant Finley.

Radcliffe L. Romeyn, Jr., Newport, R.I., pro se.

## OPINION AND ORDER

SELYA, District Judge.

On November 29, 1984, The Bank of New York (BONY), plaintiff herein, filed this suit against four defendants, Russell L. Hoyt, R. Perry Harris, Herbert L. Finley, and Radcliffe L. Romeyn, Jr. In its eight count complaint, BONY alleged that the defendants were jointly and severally liable for the payment of a certain mortgage note (Note) by reason of their respective affiliations with the partnership obligor and in their capacity as guarantors. Jurisdiction was premised on diversity of citizenship and the existence of a controversy of the requisite monetary magnitude. 28 U.S.C. § 1332.

After certain procedural skirmishing had taken place (none of which is germane at present), three of the defendants filed answers which raised usury defenses under state law, viz., R.I.Gen.Laws §§ 6–26–2, 6–26–4. And, the identical trio of defendants filed counterclaims against BONY which pivoted off the same state statutes.[1]

The plaintiff thereafter moved for partial summary judgment, Fed.R.Civ.P. 56, challenging the sufficiency of the defendants' use of the Rhode Island usury laws either defensively (in their respective answers) or offensively (as a basis for their respective counterclaims). The defendants objected. Several affidavits were duly filed, and documentary proffers were made. In addition, statements as to the existence *vel non* of disputed issues of material fact were docketed in accordance with the mandate of D.R.I.L.R. 12.1(a). And, the matter was amplitudinously briefed.

On June 21, 1985, oral argument was heard. At that time, the court pressed for a consensus as to whether or not any unresolved fact issues stood in the way of *brevis* determination of the legal points which underlay the motion. Counsel were afforded a post-hearing opportunity to identify any such. The only further response was from the defendant Hoyt, who acknowledged the accuracy of the plaintiff's Local Rule 12.1(a) statement (though pointing out, with lawyer-like caution, that this concession in no way withdrew the defendants' announced position on the ultimate legal issue). So, inasmuch as no party has been able to illuminate any disputed issue of material fact, the motion appears ripe for decision.

### I.

The court begins by presenting the factual context in which the matter sub judice

---

1. The protagonists here include all of the defendants except Romeyn (who has not at this juncture raised any usury claim). For the sake of simplicity, however, the court uses terms such as "the defendants objected" to limn the stance taken collectively by Hoyt, Harris, and Finley. Those defendants have assumed substantially identical positions on the issue. Hoyt suggests the usury question as the ninth defense

of his answer to the complaint; Harris raises the point as the third defense enumerated in his answer; and Finley labels it as his eighth defense. These defenses appear verbatim as pleaded in Appendix 1. Each of these defendants also employs the notion offensively as the second count of his counterclaim. *See* Appendix 2.

arises. (The facts are, of course, culled from the affidavits, Local Rule 12.1(a) statements, and documentary proffers of record.)

On September 26, 1980, BONY closed a construction loan agreement (Agreement) with Brenton's Cove Development Company (Cove), a Rhode Island limited partnership, by means of which the bank agreed to advance some $5,500,000 to Cove to finance the development of a parcel of property which Cove had acquired in a posh section of Newport, Rhode Island. On the same date, Cove executed and delivered the Note, promising to repay to BONY all sums advanced under the Agreement, together with interest and collection costs. The Note was secured by a first mortgage (Mortgage) on the subject property (including the contemplated improvements) and by guarantees executed by Hoyt, Harris, Finley, and Romeyn.[2] Finley and Romeyn were the general partners of Cove, whereas Hoyt and Harris were limited partners. (The plaintiff has alleged that the latter individuals were sufficiently immersed in Cove's control that they should be deemed to have attained general partner status; it is unnecessary for the court to determine the partnership rank of Hoyt and/or Harris at this time.)

The Note provided for a variable interest rate of prime plus 1%, to be computed and paid monthly. It did not expressly limit the use of the proceeds to the construction of residential improvements. But, it is clear beyond cavil that the loan documents and the architectural plans for the project (which plans were incorporated by reference in the Agreement), read in a unitary fashion, required that the condominium units to be built upon the property would be designed for use as dwellings and that the development would be residential in character. All parties in interest intended that 32 condominium apartments be so constructed, that intention was realized, and the property has indeed been inhabited for residential living since the initial units were erected on the site. The Mortgage was placed on record in Newport on September 29, 1980. It was then, and remained throughout, a first lien on the subject property.

The Note matured on April 1, 1982, but Cove failed to pay the balance due. Settlement efforts followed at some length, but to no avail. On August 14, 1984, Cove sought protection under chapter 11 of the federal bankruptcy code. 11 U.S.C. §§ 1101–1174 (1982). The instant action was docketed shortly thereafter, seeking to recover in excess of $4,000,000 (the amount allegedly owing on the Note).

## II.

The usury claim is straightforward. The parties acknowledge that, at the times material hereto, state law imposed a statutory ceiling of 21% as the maximum chargeable rate of interest for a loan of this genre. *See* R.I.Gen.Laws §§ 6–26–2, 4. The defendants aver that the variable rate postulated by the Note exceeded the state usury rate at certain points in time. And, for purposes of the instant motion, BONY has conceded this to be the case.

The question presented, therefore, is a deceptively simple one: has federal law preempted state usury restrictions with respect to transactions of the type and kind entered into by and between BONY and Cove? The issue is one of novel impression.

## III.

■ The law is settled that summary judgment will ordinarily be granted if (i) there is no genuine issue as to any material fact and (ii) it appears with sufficient clarity that the movant is as a matter of law entitled to prevail on the claim or defense to which the motion appertains. *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976); *United Nuclear Corp.*

---

**2.** The guarantees of Finley and Romeyn bore no ceiling. The remaining assurances were each limited to $1,000,000. On January 19, 1982, however, Hoyt guaranteed an additional $180,-000 of the indebtedness.

*v. Cannon,* 553 F.Supp. 1220, 1226 (D.R.I. 1982). *See* Fed.R.Civ.P. 56(c). Here, the pertinent facts brook no controversy. Thus, if the plaintiff's view of the law is sound, the usury claims and defenses are ripe for *brevis* disposition. *Thyssen Plastik Anger KG v. Induplas, Inc.,* 576 F.2d 400, 401 (1st Cir.1978); *Cannon,* 553 F.Supp. at 1226.

■ It should be noted that the parties have briefed and argued all state law questions in terms of Rhode Island's jurisprudence. Thus, in this diversity action, "the court may accept the implicit concession that Rhode Island's substantive law governs in the premises." *Oman International Finance Ltd. v. Hoiyong Gems Corporation,* 616 F.Supp. 351, 358 n. 5 (D.R.I.1985) (citations omitted). In any event, the Note contained a choice of law provision evidencing the parties' intention that the law of Rhode Island control.

## IV.

### A. *The Defendants' Arguments*

The engine which generates BONY's preemption argument is § 501 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (Act), Pub.L. No. 96–221, Title V, § 501, 94 Stat. 132, 161–63 (1980). The Act has been twice amended, first by the Housing and Community Development Act of 1980, Pub.L. 96–399, Title III, § 308(c)(6), § 324(a), (e), 94 Stat. 1614, 1641, 1647, 1648 (1980), and then by the Omnibus Budget Reconciliation Act of 1981, Pub.L. 97–35, Title III, § 384, 95 Stat. 357, 432 (1981). Section 501, for reasons not readily apparent to the court, has never been codified in the United States Code, but its text does appear in the historical note following 12 U.S.C. § 1735f–7.

Section 501(a)(1) provides in pertinent part that:

> The provisions of the constitution or the laws of any State expressly limiting the rate or amount of interest ... taken, received, or reserved shall not apply to any loan, mortgage, credit sale, or advance which is ... secured by a first lien on residential real property....

And, though § 501(a)(1) does establish further conditions governing eligibility for the benefices of federal preemption, the parties have agreed that all of these conditions either have been met in this instance or are inapposite to this transaction.

The defendants advance two main arguments in support of their joint contention that, in the circumstances at bar, the plaintiff is not entitled to the prophylaxis of § 501(a)(1) of the Act. They asseverate, first, that since neither the Note nor the Mortgage expressly limited the use of the loan proceeds to the construction of residential condominiums, the federal statute was not invoked. Alternatively, the defendants claim that § 501(a)(1) does not apply to construction financing in circumstances where the borrower and the ultimate homeowner are distinct from one another. (The gist of this latter theory is that when a developer borrows funds to build housing for resale to third parties, the transaction is "commercial" rather than "residential" in character.) The court will examine each of these theses below.

### B. *The Effect of the Loan Documents*

The defendants' initial point need not long arrest the court. The Act itself is, on its face, concerned with the substance of borrowing transactions; it is as silent as the tomb concerning any especial formalities which must grace the loan documents in order to catalyze the preemptive effect of § 501(a)(1). The objectors have failed to unearth any regulation which imposes such a requirement that the Note and Mortgage explicitly restrict the use of the borrowed funds,[3] or to any caselaw pointing in that direction. And, commonsense suggests that Congress, by its silence, committed such ministerial matters to agency discretion. *Cf. Constance v. Secretary of*

---

**3.** Rulemaking authority anent § 501(a)(1) was vested by law in the Federal Home Loan Bank Board. *See* § 501(f), 94 Stat. 163 (1980).

*Health and Human Services,* 672 F.2d 990, 995–96 (1st Cir.1982); *Citizens Savings Bank v. Bell,* 605 F.Supp. 1033, 1040–43 (D.R.I.1985). If that is so, the absence of any regulation along the lines espoused here by the defendants is itself reflective of an administrative decision that no such requirement was warranted. "It is not for the courts to meddle in such obvious agency prerogatives ... without compelling cause." *Id.* at 1041. What is more, there is an utter absence of cause—compelling or otherwise—here.

The Act, it must be remembered, was considered during an epoch (1979–80) in which market interest rates had escalated meteorically. *See United States v. Ven-Fuel, Inc.,* 758 F.2d 741, 764–65 n. 20 (1st Cir.1985) (cataloguing prime rate, national average by year, 1975–83). As interest levies edged closer and closer to state usury ceilings, Congress exhibited specific concern over the economic problems associated with home mortgage financing. In a Senate Banking, Housing and Urban Affairs Committee pre-passage report on the bill (then known as H.R.Res. 4986), the shortage of mortgage funds was spotlighted. And, it was made clear that, in the legislative view, this monetary dessication was an artificial one, attributable to the existence of (state) usury ceilings which capped interest rates at a level below that at which demand for those funds could be satisfied. S.Rep. No. 368, 96 Cong., 2nd Sess. 18, 19, *reprinted in* 1980 U.S.Code Cong. & Ad. News 236, 254. The Congress aimed "to ease the severity of the mortgage credit crunches" by emasculating such limits. *Id.* The congressional record is replete with statements of concern over the difficulty—in some cases, the impossibility—which ordinary Americans were experiencing in obtaining home mortgages. *See, e.g.,* 126 Cong.Rec. H 6972 (March 27, 1980) (remarks of Representatives Rousselot and St. Germain). The Act represented a reasoned and compassionate congressional re-

sponse to the perceived problem; in so acting, the Congress nowhere evinced any special intent to require proof of a home-buyer's intent by way of ritualistic recitals in a loan document. The notion that either the Note or the Mortgage must, within the four corners of the instrument, invoke the balm of § 501, is alien to the thrust and tenor of the statute. Indeed, the imposition of such a condition would fulfill no purpose other than the creation of yet another bureaucratic technicality.

■ Section 501(a)(1) contains plain and unambiguous language. The usual rule dictates that a court apply such a statute without embroidery, according to its terms. *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917); *Ciampa v. Secretary of Health and Human Services,* 687 F.2d 518, 524 (1st Cir. 1982). Given the absence of the slightest hint of any legislative intention to the contrary, the sweep of the enactment should be allowed to operate unfettered by judicial editing. *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982); *Lane v. United States,* 727 F.2d 18, 20 (1st Cir.1984). And, such a result is all the more palatable in this case inasmuch as the formulary incantations to which the defendants would attach talismanic effect achieve nothing of substance in furtherance of the stated objectives of the Act.[4] This court is loath lightly to presume that Congress, sub silentio, meant to require that beleaguered homebuyers be forced to engage in mindless pettifoggery in order to be relieved of the oppressive burden imposed by a withered mortgage market. As this court has noted in an analogous context: "There is no rhyme or reason in requiring a party to dance a ritualistic jig purely for its own sake." *Lopez v. Bulova Watch Co.,* 582 F.Supp. 755, 764 (D.R.I.1984).

■ From the moment in time that Cove conceived of this project, it proposed to

---

**4.** The argument which these defendants make presents a situation antithetical to one where tracking the language of a law literally "would lead to absurd results ... or would thwart the

obvious purpose of the statute." *Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978). There is no such impediment here.

erect a residential condominium complex. The bank financed the construction of that very complex. It was built, and is now being occupied, on just such a basis. This is an instance when the reality of events coalesces with the vision of the national legislature. The court concludes that § 501(a)(1) does not require that loan or mortgage documents specifically contain an express limitation that the mortgaged premises be dedicated to occupancy as dwellings. Where, as here, the structures are designed and built for human habitation, it suffices that the parties intend to use the property for, and in fact do devote it to, residential use.

## C. Construction Financing for Residential Developers

The question of whether the safety net woven by § 501(a)(1) extends to loans made to developers, as well as to loans made to homebuyers, is a closer one. The Act, on its face, can plausibly be subjected either to the restrictive reading promoted by Hoyt, Harris, and Finley, or to the more expansive view hawked by the bank. In such straitened circumstances, courts have turned to the legislative history of the ordinance in order to resolve ambiguities. *See, e.g., Fidelity Federal Savings & Loan Association v. De La Cuesta,* 458 U.S. 141, 159–67, 102 S.Ct. 3014, 3025–30, 73 L.Ed.2d 664 (1982); *United States v. Donruss Co.,* 393 U.S. 297, 303–07, 89 S.Ct. 501, 504–07, 21 L.Ed.2d 495 (1969); *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.,* 754 F.2d 404, 414–15 (1st Cir.1985). In the case at bar, however, the legislative history is itself amphibolous: it does not supply a clear answer as to whether § 501(a)(1) applies only to mortgage loans made to borrowers who intend to reside in the mortgaged premises.

The starting point for an analysis of the legislative history of the Act is to be found in Senate Report 368, *supra.* Although that compilation does not specifically address the question which has been raised in this litigation, it leaves no doubt as to the overriding concerns of the Congress at the time the Act was passed. Thus, the Senate Report intoned:

The Committee finds that where state usury laws require mortgage rates below market levels of interest, mortgage funds in those states will not be readily available and those funds will flow to other states where market yields are available. This artificial disruption of funds availability not only is harmful to potential homebuyers in states with such usury laws, it also frustrates national housing policies and programs.

*Id.* at 19, 1980 U.S.Cong. & Ad.News at 254.

Remarking on the need for a "stable home financing system," *id.,* and on a determination that "the severity of the mortgage credit crunches of recent years" must be eased, *id.* at 18, 1980 U.S.Code Cong. & Ad.News at 254, the senators concluded:

The Committee believes that this limited modification in state usury laws will enhance the stability and viability of our Nation's financial system and is needed to facilitate a national housing policy and the functioning of a national secondary market in mortgage lending.

In addition to the adverse effects of usury ceilings on credit availability, mortgage rate ceilings must be removed if savings and loan institutions, as directed by other provisions of [the Act], are to begin to pay market rates of interest on savings deposits. Without enhancing the ability of institutions to achieve market rates on both sides of their balance sheets, the stability and continued viability of our nation's financial system would not be assured. Thus, Federal preemption of State usury ceilings would not only promote national home financing objectives but would provide the resources with which savers could be paid more interest on their savings accounts.

*Id.* at 19, 1980 U.S.Code Cong. & Ad.News at 255.

■ The concerns of the Congress can thus be seen as two-fold: (i) to promote the "stability and viability" of financial institutions by allowing them to charge and col-

lect realistic market interest on mortgage loans,[5] and (ii) to promote the national housing policy and the American dream of home ownership by legislatively opening a spigot which would insure an increased and evenly-spread flow of available mortgage money. *See generally Lindenberg v. First Federal Savings and Loan Ass'n*, 528 F.Supp. 440, 446–47 (N.D.Ga.1981).

Though this archival data does not in any sense compel a conclusion favorable to BONY's position, it is suggestive of such a result: to the extent that the national housing policy envisions home ownership, Congress would be offering only half a loaf by stepping up the availability of mortgage financing to homebuyers alone. Without an adequate supply of dwelling units on the market—a supply which, logic dictates, could only be insured by making construction funds available to residential developers—, mere accessibility to purchase money holds out a somewhat hollow promise. The homebuyer's cup would, at best, only be half full. And in the same vein, the lenders' competitive position is more marginally enhanced if banks are freed from the factitious gyves of state usury laws only to the lesser extent envisioned by the defendants. Rather than releasing depository institutions from the shackles which Congress perceived as binding them, the Act, in the defendants' narrower view, would merely have polished the handcuffs.

■ The court turns next to the colloquy in the Congress, mindful withal that statements of individual members of Congress on the floor or in committee are not reflexively to be accorded the same weight as committee reports and the like. *Cf. Cia. Petrolera Caribe*, 754 F.2d at 423–24 (pointing out conflicting meanings apparently attached to use of the term "dissolution" in floor debates anent the Clayton Act, 15 U.S.C. § 26 (1982)). The Congres-

sional Record of March 27, 1980 reflects the following exchange between Congressman St. Germain (a spokesman for the proposed legislation in the House debate) and Representative Wylie:

Mr. WYLIE. I thank the gentleman for yielding. I just wanted to ask a question on the subject of usury while we are here. The gentleman from California (Mr. Rousselot) is making a contribution to the legislative history on this bill, as usual, but he has been asking general questions on the usury ceiling. I would like to get more specific. With regard to the preemption of usury ceilings on business and agriculture loans above $25,000, is it contemplated that a mortgage loan on commercial property can be considered a business loan for purposes of this particular preemption? I think I know what the answer will be, but I would like to establish it in this colloquy as a matter of legislative history.

Mr. ROUSSELOT. I appreciate my colleague's question.

Mr. ST GERMAIN. If the gentleman will yield, I would answer in the affirmative on that.

Mr. WYLIE. That was my impression. . . .

126 Cong.Rec. H6979 (March 27, 1980).

In the context of the proceedings then ongoing, it is crystal clear that the topic under discussion was not § 501(a)(1), but a sister provision, § 511 of the Act.[6] This distinction is critical, as § 511 embodies a materially different preemption scheme (in respect to "business" and "agricultural" loans). While the quoted interlocution does make it plain that Congress intended to fit interim financing for *commercial* property within the folds of the § 511 tent, it bespeaks no like intent with regard to *resi-*

---

**5.** Congressional interest in the competitive position of the banking industry was not the only factor in arriving at this furculum of the legislative purpose. The Congress was concerned, too, with insuring the ability of depository institutions to "permit small savers to receive a market rate of return on their deposit accounts." Sen-

ate Report 368 at 18, 1980 U.S.Code Cong. & Ad.News at 254. Thus, insofar as the Act impacted the financial world, it benefitted not only lenders and borrowers, but savers as well.

**6.** Section 511 is now codified at 12 U.S.C. § 86a (1980).

*dential* property. More importantly, the discussion fails to illumine the reach of § 501 in any way.

Later that day, the following dialogue, which has become the centerpiece of the defendants' presentation, took place:

Mr. MATTOX. Mr. Speaker, I would like to engage in a colloquy, if possible, with the subcommittee chairman, the gentleman from Rhode Island (Mr. St Germain).

Mr. Speaker, I have four basic questions that concern me in this legislation, and I want to make sure I understand what the committee's intent is on those matters. If I may, I will ask the questions.

Does a loan issued to a builder for the construction of commercial property like a shopping center, for instance, constitute a business loan within the definition of *the statute?*

Mr. ST GERMAIN. Mr. Speaker will the gentleman yield?

Mr. MATTOX. I yield to the gentleman from Rhode Island.

Mr. ST GERMAIN. Mr. Speaker, as the gentleman from Ohio (Mr. Wylie) pointed out, the answer is: Absolutely.

Mr. MATTOX. Mr. Speaker, the next question is this: Does a loan issued to a builder, a homebuilder, for the purpose of constructing residential dwellings for the purpose of resale to homebuyers constitute a business loan, or is it a residential loan?

Mr. ST GERMAIN. Mr. Speaker, this would be business financing. It is a business loan in that there is indeed interim financing: Therefore, it would be a business loan.

126 Cong.Rec. H6983 (March 27, 1980) (emphasis added).

Once again, context is all important to place Congressman St. Germain's reply into proper perspective. Though the reference by Congressman Mattox to "the statute" was admittedly a cryptic one, there

can be little doubt but that Representative St. Germain understood the first question to relate to § 511.[7] Congressman Mattox's follow-on query appears (understandably) to have been answered by Mr. St. Germain with § 511, not § 501(a)(1), in mind. Accordingly, the defendants' reliance on the remark as a device to shed decisive light on the meaning of § 501 seems misplaced. And, this conclusion is fortified by the total absence of any other morsel in the legislative history tending to import a similar "business loan" connotation to residential construction financing under § 501. Courts, for good reason, have long been chary of the weight-bearing capacity of random commentary in a lengthy legislative record. *See New England Power Co. v. New Hampshire*, 455 U.S. 331, 342, 102 S.Ct. 1096, 1102, 71 L.Ed.2d 188 (1982), quoting *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124 (1977) ("Reliance on ... isolated fragments of legislative history in divining the intent of Congress is an exercise fraught with hazards, and 'a step to be taken cautiously' ").

The court's view of the ultimate irrelevance of the St. Germain/Mattox discussion vis-a-vis the question at bar is also entirely consistent with the statutory mosaic, seen as a whole. The Act, when passed, contained within Title V alone no less than five preemption provisions, viz.: overrides in respect to (i) residential mortgage loans, § 501, 94 Stat. 161–63 (1980); (ii) business and agricultural loans, § 511(a), 94 Stat. 164 (1980); (iii) loans granted by federally-insured savings and loan associations, § 522, 94 Stat. 165 (1980); (iv) loans granted by federally-insured credit unions, § 523, 94 Stat. 166 (1980); and (v) loans extended by small business investment companies, § 524, 94 Stat. 166–67 (1980). Some overlapping was inevitable. Congress, fully cognizant that a specific advance might well slip within the integu-

---

7. In this vein, the reference to the prior discussion with Congressman Wylie is telling. (That discussion is quoted *ante* at page 1311.)

ment of more than one of these dispensations, covered that contingency:

> In any case in which one or more provisions of, or amendments made by, this title [i.e., Title V of the Act], section 529 of the National Housing Act, or any other provision of law, including section 5197 of the Revised Statutes (12 U.S.C. § 85), apply with respect to the same loan, mortgage, credit sale, or advance, such loan, mortgage, credit sale, or advance may be made at the highest applicable rate.

§ 528, 94 Stat. 168 (1980).

Section 528 itself informs the Act as an entirety: Congress recognized the imbricated texture of certain borrowings and ordained that, in such circumstances, the provision of federal law most hospitable to the viability of the loan should apply. There is no question that third-party residential construction financing would qualify for § 511 preemption—and this is the most that the St. Germain/Mattox colloquy proves. Especially in light of § 528, however, that exchange fails adequately to pinpoint whether § 501 is also available with regard to such a mortgage loan.[8]

In short, the objectors have made an argument which, if it is to be accepted, demands red meat and strong drink; yet, they seek to nourish the contention with no more than a few stale crumbs of periphrastic badinage and the tepid waters of misdirected supposition and surmise.

■ The broader vista which BONY imparts to the sweep of § 501 is more in harmony with the overall goals of the Act, is not inconsistent with the legislative history, and, comports with the prevailing administrative winds. Section 501(f) of the Act empowered the Federal Home Loan Bank Board (FHLBB) "to issue rules and regulations and to publish interpretations governing the implementation of this section." 94 Stat. 163 (1980). Despite the absence of formal rulemaking, the FHLBB has spoken informally through various opinion letters issued by its general counsel. To be sure, the FHLBB has acknowledged that the power to make formal interpretations has not been delegated to the general counsel. *See* Op.Gen.Counsel FHLBB (OGCF) No. S82, Dec. 20, 1983. Such missives were, therefore, forwarded without the benefit of public comment and the assurances of care and deliberation which attend more formalistic pronouncements. Like interpretative rules, *see, e.g.,* K. Davis, *Administrative Law Treatise,* §§ 7:8, 7:11 (2d ed. & Supp.1982), opinion letters may serve to clarify the agency's viewpoint, but they are not legally binding. Even so, they cannot be lightly brushed aside.

■ At the least, these expressions of the regulators' thinking furnish some measure of guidance to a reviewing court. *See Skidmore v. Swift & Co.,* 323 U.S. 134, 138–40, 65 S.Ct. 161, 163–64, 89 L.Ed. 124 (1944); *Nason v. Kennebec County CETA,* 646 F.2d 10, 17–19 (1st Cir.1981); *Rudisell v. Fifth Third Bank,* 622 F.2d 243, 250 (6th Cir.1980); *Bright v. Ball Memorial Hospital Association,* 616 F.2d 328, 333 n. 1 (7th Cir.1980). As such opinions form the basis of some meaningful precedent, they are to be given weight if they show thoroughness in consideration, validity in reasoning, consistency, and "all those factors which give [the] power to persuade, if lacking power to control." *Skidmore,* 323 U.S. at 140, 65 S.Ct. at 164. This is especially true where, as here, "the question is intricately related to the agency's area of special expertise." *Citizens Savings Bank v. Bell,* 605 F.Supp. at 1042. And, deference is often singularly appropriate when (as in this case) the apposite statutory language, while not ambiguous, is not explicit. *Cf. Chevron U.S.A., Inc. v. Natural Resources Defense Coun-*

---

**8.** The fact that residential construction financing would, ceteris paribus, qualify for preemption under § 511 does not mean that the Note in the case at bar qualified for § 511 preemption. The plaintiff readily admits that its loan, for various other reasons, was not entitled to safe harbor under § 511. Therefore, the presence of § 511 fails, in this case, to moot the question presented by the defendants' usury claims.

*cil, Inc.,* —— U.S. ——, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984).

 Of course, when dealing with either formal or informal agency interpretations of a statute, "the deference due . . . is far from blind allegiance." *Citizens Savings Bank,* 605 F.Supp. at 1042. Particularly in the relatively unstructured realm of informal interpretive rulings, the statute remains the sole criterion of what the law allows and what it forbids. At bottom, the true measure of the weight to be accorded to the regulators' view inevitably depends upon the persuasive force of the interpretation, given the totality of the attendant circumstances. *Skidmore,* 323 U.S. at 140, 65 S.Ct. at 164; *Mayburg v. Secretary of Health & Human Services,* 740 F.2d 100, 105–06 (1st Cir.1984); *Citizens Savings Bank,* 605 F.Supp. at 1042.

In this case, the convictive force of the general counsel's ideas is potent. The opinion letters adequately evince the regulators' firm belief that the reach of § 501(a)(1) extends to third-party construction financing. *See, e.g.,* OGCF No. 60, June 2, 1980. *See also* OGCF No. 67, June 30, 1980 (loan to real estate partnership to acquire land for condominum project); OGCF No. 65, Aug. 8, 1980; OGCF No. S 12, Feb. 20, 1981 ("In our opinion, it does not matter that the borrower does not intend to occupy the dwelling"). And, the belief so expressed appears to be rooted in a comprehensive understanding of the Act, a good grasp of the circumstances which existed at the critical time, and a sensitive perception and analysis of congressional motivation.

OGCF No. 60, for example, advances a powerful argument for interpreting § 501 to include construction financing of the type and kind here at issue:

[W]e agree that inclusion of construction loans in the residential mortgage preemption is consistent with the Congressional intent behind § 501. The mortgage override reflects Congressional concern that mortgage lenders are particularly affected in periods of high interest rates. *See* S.Rep. No. 368, 96th Cong., 1st Sess. 18–19 (1979). In remedying this situation, Congress made the preemption applicable to all first lien loans, a category much broader than consumer purchase money mortgages. It must be presumed that Congress reasoned that the soundest approach to the tight money problem lay in removing interest limitations from a substantial portion of the loans made by mortgage lenders. Accordingly, we find no reasonable basis for assuming that Congress would have excluded a mortgage lending activity as important as construction lending from coverage under § 501.

*Id.* at 4–5.

In authoring this opinion, the general counsel specifically considered—and rejected as indecisive—the Mattox/St. Germain discourse upon which the defendants rely. OGCF No. 60 bears the hallmarks of thoroughness and of sound reasoning. And, as noted above, the policy considerations which underlay § 501, *see ante* at pages 1310–1311, point persuasively towards approval of the agency's position. Inasmuch as the regulatory determination, albeit informally conceived, "is a commonsense one which abridges no statutory command," *Audet v. Board of Regents,* 606 F.Supp. 423, 429 (D.R.I.1985), it is in this instance worthy of considerable deference.[9]

There is yet another bulwark in support of the bank's reading of the Act. Section 501(a)(1)(C)(i), 94 Stat. 161 (1980), abolished the prior limitation that "residential proper-

---

**9.** It should be noted that, pursuant to its statutory rulemaking authority under § 501(f), the FHLBB has issued a more formal regulation which defines "residential real property," for these purposes, as "real estate improved or *to be improved* by a structure or structures designed primarily for dwelling, as opposed to commercial, use." 12 C.F.R. 590.2(f) (1985) (emphasis supplied). This regulation, too, dovetails with the opinion letters discussed in the text. The clear meaning of the underscored phrase was to embrace construction financing, and there is no indication, express or implied, that such an extension should artificially be limited to first-party building loans.

ty" be designed for the occupancy of one to four families. The elimination of this cap makes manifest the intent of Congress that the preemptive sheath of § 501 was meant to encase multiunit housing without regard to project size. By inference, it can logically be deduced from the enactment of § 501(a)(1)(C)(i) that Congress intended interim financing for all multi-family housing designed for eventual owner-occupancy to pass muster. Given the severity of the problem faced by homebuyers in 1980, it beggars credulity to conclude that Congress meant to favor a resident entrepreneur in a 50 unit project over a non-resident entrepreneur in an otherwise similar situation.

 When Congress employs inexplicit language in a statute and the specific congressional intent is therefore less than definite, "a court should interpret the provision generously so as to effectuate the important congressional goals." *Cia. Petrolera Caribe*, 754 F.2d at 428 (footnote omitted). This canon is peculiarily appropriate for application in this case, as Congress was obviously well aware that the mischief caused by state usury laws in an inflationary economy could take many forms. Following this prudential precept, and consistent with the reliable signposts which do appear in the legislative history and in the proceedings of the FHLBB, the court finds that the will of the Congress can best be effectuated by interpreting § 501(a)(1) of the Act to embrace construction loans made to third-party developers for the building of dwellings which are to be offered for sale to individual homebuyers, so long as the other conditions of the statute are fulfilled. That is the case here. *See ante* at page 1308. BONY's mortgage loan to Cove was therefore an advance applicable to "residential real property" within the purview of the Act.

### V.

 In fine, the court holds that no convictional force resides within the four walls of the defendants' arguments. Congress, in passing the law, desired to facilitate home ownership by eliminating artificial money market barriers which threatened to evaporate the pool of available mortgage funding. The Act, fairly read, did not hedge this relief by demanding that loan documents contain formalistic recitals beyond those necessary to insure that each affected mortgage would constitute a valid first lien on the subject property. And, consistent with the tenor and spirit of the legislation, § 501(a)(1) embraced first priority construction financing extended to developers for the erection of housing units which would thereafter be offered for sale to homebuyers. The statute therefore insulated the instant loan and mortgage against any inroads under state usury laws, and R.I.Gen.Laws §§ 6–26–2, 4 are insufficient either to bar BONY's recovery on the Note and guarantees or to bottom an actionable claim for rescission of the loan transaction.[10]

The plaintiff's motion for partial summary judgment is granted. Hoyt's ninth defense, Harris's third defense, and Finley's eighth defense are each and all stricken. The second count of each of the three defendants' counterclaims is dismissed with prejudice.

*It is so ordered.*

#### Appendix 1

1. *Answer of Defendant Russell L. Hoyt*

*"Ninth Defense*

The interest rate charged or obtained by the Bank in the Mortgage Note was usurious in violation of R.I.Gen.Laws §§ 6–26–2 and 6–26–4. Hence the Note is void and any guaranty thereof is null and void."

2. *Answer of Defendant R. Perry Harris*

*"Third Defense*

44. The Mortgage Note was usurious and void in that the Bank, directly or

---

**10.** In view of this holding, it is unnecessary for the court to consider whether these defendants—as opposed to Cove (which was, after all, the borrower in this transaction)—have standing to maintain the asserted counterclaims under the state statutes.

indirectly, reserved, charged or took interest at a rate in excess of that permitted by applicable laws, including Rhode Island G.L. 6–26–2 and 6–26–4."

3. *Answer of Defendant Herbert L. Finley*

"Eighth Defense

The interest rate charged or obtained by plaintiff in the Mortgage Note was usurious in violation of Rhode Island General Laws §§ 6–26–2 and 6–26–4. Hence the Note is void and any guaranty thereof is null and void."

*Appendix 2*

1. *Count II of Counterclaim of Defendant Russell L. Hoyt*

COUNT II

18. The Mortgage Note (Exhibit 2) was usurious in that it directly or indirectly charged an interest rate in excess of that permitted by applicable laws, including R.I. Gen.Laws §§ 6–26–2 and 6–26–4.

19. As a result of the usurious interest charged by the Bank as alleged in paragraph 18, Hoyt, as a limited partner of BCDC, is entitled under R.I.Gen.Laws § 6–26–4 to recover his partnership share of the interest and principal paid by BCDC on the Mortgage Note.

WHEREFORE, counterclaim plaintiff Hoyt demands judgment against counterclaim defendant the Bank of New York to recover his partnership share of the payments of interest and principal made by BCDC on the Mortgage Note, plus interest and costs.

2. *Count II of Counterclaim of Defendant R. Perry Harris*

COUNT II

58. By reason of the conduct alleged in paragraph 44, Harris as a limited partner of BCDC is entitled under Rhode Island G.L. 6–26–4 to recover his partnership share of payments of principal and interest which were made by BCDC on the Mortgage Note.

WHEREFORE, plaintiff Harris demands judgment against the Bank of New York to recover his partnership share of such payments of principal and interest as were made by BCDC, all in an amount to be determined by the jury.

3. *Count II of Counterclaim of Defendant Herbert L. Finley*

COUNT II

15. The Mortgage Note (Exhibit 2) was usurious in that it directly or indirectly charged an interest rate in excess of that permitted by applicable laws, including Rhode Island General Laws §§ 6–26–2 and 6–26–4.

16. As a result of the usurious interest charged by the Bank as alleged in paragraph 15, Finley is entitled under Rhode Island General Laws § 6–26–4 to recover his partnership share of the interest and principal paid by BCDC on the Mortgage Note.

WHEREFORE, Finley demands judgment on his counterclaim against the Bank of New York to recover his partnership share of the payments of interest and principal made by BCDC on the Mortgage Note, plus interest and costs.